Thomas W. BANKS, Petitioner,

v.

COMMISSIONER OF INTERNAL REV-ENUE, Respondent.

No. 17150.

United States Court of Appeals
Eighth Circuit.

Sept. 12, 1963.

Joseph A. Maun, of Maun, Hazel, Green, Hayes, Simon & Aretz, St. Paul, Minn., for petitioner.

Burton Berkley, Atty., Dept. of Justice, Washington, D. C., for respondent and Louis F. Oberdorfer, Asst. Atty. Gen., Washington, D. C., and Lee A. Jackson and Joseph M. Howard, Attys., Dept. of Justice, Washington, D. C., on the brief.

Before VOGEL, BLACKMUN and RIDGE, Circuit Judges.

BLACKMUN, Circuit Judge.

The Tax Court, by its decision entered March 15, 1962, has held, among other things, that there were deficiencies aggregating $194,522.34 in Thomas W. Banks' income and victory taxes for the calendar years 1942–1947, inclusive, and that 50% fraud additions, under § 293 (b) of the Internal Revenue Code of 1939, and an under-estimation addition for 1947, under § 294(d) (2), were properly imposed. Banks has petitioned for review.

The case was developed on the net worth theory. The taxpayer's position here is (a) that the Commissioner's opening net worth statement was wholly inaccurate and unreliable; (b) that determination of tax based thereon was arbitrary and invalid; (c) that the Tax Court erred as to the burden of proof; (d) that certain findings were clearly erroneous; and (e) that the court erred with respect to treatment of farm inventory and breeding animals.

Judge Fisher's opinion, T.C. Memo 1961–237 and not officially reported, covers 145 pages. It was not reviewed by the full court. It sets forth the facts, some of which were stipulated, in meticulous detail. No useful purpose would be served by a similar survey in this opinion. We endeavor to confine ourselves to those facts which have some pertinence here.

*Background to 1934.* Banks filed no federal income tax returns at all for the years 1920–33, inclusive. He did file returns for 1934–47 in the Collector's office for the District of Minnesota. His wife Reta filed separate returns for 1942–47. The Director's records show that the taxpayer's 1940 return was treated as a joint return. Banks and Reta were married in 1915. She was a milliner at that time but after her marriage ceased to work and has not since been employed.

Banks, who was 64 at the time of the trial, ran away from home at 13 and went to Omaha where he worked as a hotel page boy. He was in military service in 1918. Upon his release he worked as a bell boy in Kansas City. He came to Minneapolis in 1919 as head bellman at the Dyckman Hotel. Although the Eighteenth Amendment was then in effect, he sold whiskey until July 1920 to people in the hotel and received income which he estimated at between $100 and $200 a day. From 1920 to 1924 he hauled whiskey by car from Canada and made, he testified, about $1,000 net each weekly trip. During this period he kept no records of income and expenses. From 1924 to 1929 he hauled alcohol by car from Chicago two or three times a week, making an estimated $400 or $500 a trip. His only records from 1927 through 1929 consisted of a small vest pocket notebook in which he recorded his daily sales. He kept no record of what he paid for alcohol.

In 1929 Banks pleaded guilty to a liquor conspiracy charge in federal court in Minnesota. A fine of $2,500 was imposed. He paid it.

In 1930 or 1931 for a short time the taxpayer with others (as to whose iden-

tity "I don't know") ordered alcohol shipped into the Twin Cities in box cars. He maintained offices for this business in the West Hotel in Minneapolis but "never" kept records. He had "no idea" as to the amount of money he was making in this activity. He ceased the alcohol business in 1931. He had heard of the federal income tax laws and knew he should keep records.

Banks testified that "I can't just recall" what his principal financial activity was between 1930 and 1934 but that he was not involved in any way in selling alcohol or liquor illegally.

In 1934 a charge of conspiracy under § 37 of the Criminal Code to violate §§ 3258, 3296, and 3450 of the Revised Statutes was brought in federal court in Minnesota against Banks and others. The court accepted Banks' plea of guilty. He was fined $2,000. He paid this fine.

*The 1934 offer in compromise.* In 1934 an assessment was made against Banks and others for alcohol tax liability in an amount exceeding $33,000. In July 1937 an offer in compromise was submitted with respect to this liability. It called for payment of $1,875 immediately and $150 monthly thereafter, until a total of $5,000 had been paid. The offer was accepted. In support of that offer Banks submitted an affidavit dated July 2, 1937, pertaining to his financial condition. That affidavit is important here and is set forth in full in the margin.*

* "I, Thomas William Banks, residing at 3817 Drew Avenue South, in the City of Minneapolis, County and State aforesaid, being duly sworn, depose and states as follows:

"That I am 42 years of age and am married, and that my wife's name is Reta Lee Banks. That my wife is not employed.

"That I am employed by the Old Peoria Liquor Company, 301 North Seventh St., Minneapolis. That my salary is $100 per week. That I have been employed by said company for approximately three years.

"That I also receive $25.00 per week for advertising purposes from the Seagrams Distilling Company, which I spend in entertaining customers.

"That my wife and myself have a safety deposit box in the First National Bank & Trust Company of Minneapolis, standing in the name of myself and my said wife, Reta Lee Banks.

"That my wife owns the two story house located at 3817 Drew Avenue South, Minneapolis, where we reside. That the total value of house and lot is approximately $11,000. That same is encumbered with mortgage of between $7,000 and $8,000. That I contribute $110 monthly as payments of interest and principal on such mortgage.

"That I give my wife for living expenses each month approximately $250 which included the $110 payment on house mentioned above.

"That my wife owns a cottage located at 3952 Beard Avenue South valued at about $5,000 and mortgaged for about $3,500. That the rent received for such property pays the interest, taxes and principal payments on mortgage, and that I have not contributed anything of value in connection with the acquisition of this property.

"That I own about 105 shares of Cities Service Common stock, which is listed stock and worth about $4.00 per share. That I also own twenty (20) $1,000 Insull Utility Bonds, which have no value. That I also have other stocks in my possession which are worthless and have no value and that a list of such stocks is appended hereto.

"That my wife owns 25% in the stock of Wheel Service Corporation of Minneapolis. That such stock was in my name at one time but was conveyed to her in about 1930. That such stock has cost about $4,500 in cash.

"That my wife also owns one third interest in the stock of Flour City Body Corporation of Minneapolis, which she acquired in about 1930. That I paid about $1,000 of the cost of such stock and my wife $3,000 a total of $4,000.

"That my wife owns and operated in her own name a 1935 Cadillac Sedan, and that is fully paid for.

"That my wife, Reta Lee Banks, has both checking and savings accounts in the First National Bank of Minneapolis.

"That I own two lots located in Ardmore, Oklahoma, which I have never seen. That I have continued to pay the taxes on same, which amount to between $2.00 and $3.00 per year.

"That I took out a $10,000 life insurance policy in the Penn Mutual Life Insurance Company in 1926. That such policy now has a cash surrender value of approximately $2,500 against which I have borrowed $1,500.

Each item on the affidavit was reviewed separately and investigated by a revenue agent. The agent checked the six securities stated to be of no value and found that they were worthless. He interviewed Banks personally.

At the tax court trial in 1959 Banks testified that he was not telling the truth in the affidavit; that it did not truly represent his then financial condition; that he "offered the affidavit in order to get the government to do something"; and that "they could have extended themselves a bit and they would have found out that it was absolutely not true." He also testified that, although he signed the affidavit, he did not read it. He conceded that O'Gordon, his lawyer who prepared the affidavit, explained to him that he wanted to be told about "all of your assets, all of your receivables, all of the things that you owned". Banks' statement in the affidavit that he was then insolvent originated with him and not with the lawyer. At the time the affidavit was being prepared Banks did not tell his attorney anything about cash at home or debts owed to him.

*Investigation after 1934.* From 1934 to 1940 Banks worked as a commission salesman for Old Peoria Company, a liquor distributor. In March 1936 special agent Masica, with the cooperation of revenue agent Hanson, was assigned to investigate Banks. He reviewed previous investigations and the alcohol tax files. He checked on accounts and receivables in Minneapolis banks and talked to persons "who we thought might know something about Mr. Banks' financial affairs". He interviewed Robert Kinsey, taxpayer's bookkeeper. Masica testified that Kinsey told him that he had known Banks for many years; that he had been his bookkeeper; that he "had never seen any indication that Banks had a large income at any time"; and that "he had been engaged to prepare returns for all years for which Mr. Banks might owe a tax and to work with us in getting facts straight". Masica also testified that information in connection with the returns was not forthcoming; that it was very difficult to get information; and that Banks had no records.

As a result of this investigation and by the use of the net worth method, deficiencies in tax, delinquency penalties and fraud additions were determined for 1920 through 1933. In September 1937 Banks and his wife signed Form 870 consenting to the assessment of these items. The amounts plus interest were paid by Banks in cash.

"That I also have Government War Risk Insurance, secured by reason of my service in the army, and on which I pay $196 per year as premiums. That I failed to pay the premiums for several years but understand same can still be reinstated.

"That I own Government Bonus bonds in the amount of $200, which I understand are exempt from attachment for government indebtedness.

"That I have no bank account in my name and no safety deposit box in my name other than the joint safety deposit box mentioned above. That I have no bank account and no safety deposit box in any other name.

"That I owe $2,000 to Harold Banks, Lexington, Nebraska, which I secured by giving my promissory note about January 1, 1934.

"That it is my opinion that I am actually insolvent at the present time. That the most I have ever been worth was $30,000 about 1920.

"That this affidavit is made for the purpose of disclosing my financial condition, in connection with offer in compromise filed by Peter Valder in July, 1937, to try and settle an assessment of $33,589.92 made in June, 1934.

(Signed) THOS. W. BANKS"

\* \* \* \* \*

"List of Stocks referred to in affidavit of Thomas William Banks, dated April 8, 1937.

| | |
|---|---|
| 60 shares Central Public Service | Worthless |
| 300 shares American Eagle Aircraft Corp. | " |
| 55 shares Corporation Securities Co. | " |
| 300 shares Krueger & Toll Co. | " |
| 52 shares Foote Bros. Gear & Machinery Co. | " |
| $1,000 par value bonds of American Commonwealth Corp. | " " |

In April 1946 special agent McKusick began an investigation of the taxpayer for the years 1937 through 1947. McKusick was later joined by revenue agent Kleven. He completed his investigation and submitted his report in 1951. He started his work by obtaining the returns from the agents to whom they had been routinely assigned. The Masica report was reviewed. Special agents were instructed to go to banks and examine every cashier's check, money order, and certified check. McKusick and others looked for both assets and liabilities for each year and the persons involved. He examined books and records of numerous business places and of individuals. He called on approximately 150 different establishments to determine whether the taxpayer had an investment or interest in them. He inquired as to gifts or inheritances the taxpayer may have received during the period.

Leonard Weinstock, an accountant, prepared the federal income tax returns for taxpayer and his wife from 1942 to the time of trial. Weinstock also maintained records or did accounting work for enterprises in which Banks had a financial interest and for Harry Shepard, a partner. After the investigation of Banks, Weinstock made a voluntary disclosure for Shepard up to 1950 and prepared and submitted a net worth statement for Shepard which included an addition to tax for fraud.

The investigation disclosed that many of Banks' dealings were consummated in currency and in large amounts. McKusick never saw any personal books and records of Banks although he inquired about them. The 90-day letter was issued in April 1952 prior to the beginning of the trial on the criminal charges.

*The third criminal charge.* In January 1952 Banks was indicted in the District of Minnesota for income tax evasion, in violation of § 145(b) of the 1939 Code, for the years 1945, 1946, and 1947. He entered a plea of not guilty. The government prosecuted the case upon the net worth approach, starting with December 31, 1936, and Banks' 1937 affidavit. The jury returned a verdict of guilty on all three counts. Banks received a general sentence of three years and a fine of $10,000. United States v. Banks, 45 A.F.T.R. 1154 (D.Minn.1952). The judgment of conviction was appealed but was affirmed by this court. Banks v. United States, 204 F.2d 666 (8 Cir., 1953). The Supreme Court first denied certiorari, 346 U.S. 857, 74 S.Ct. 73, 98 L.Ed. 370, but then vacated that denial, 347 U.S. 1007, 74 S.Ct. 861, 98 L.Ed. 1132 Later certiorari was granted, 348 U.S. 905, 75 S.Ct. 311, 99 L.Ed. 710, and the case remanded, with others, for consideration in the light of Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954), and its companion cases, then recently decided, enunciating principles applicable to net worth cases. This court reaffirmed. Banks v. United States, 223 F.2d 884 (8 Cir., 1955). Certiorari was denied, 350 U.S. 986, 76 S.Ct. 472, 100 L.Ed. 853. Two post-conviction proceedings are reported as United States v. Banks, 108 F.Supp. 14 (D.Minn.1952), and Banks v. United States, 245 F.2d 411 (8 Cir., 1957).

The taxpayer points out that in the criminal case he offered no evidence but relied on his motion for judgment of acquittal. This indicates that his able counsel at that trial felt the government had not proved its case. It is accordingly emphasized here that none of the defense material presented in the Tax Court was before the court and jury in the criminal proceedings.

*Taxpayer's returns.* The taxpayer's returns for the calendar years 1937 through 1947, as filed, reported adjusted gross income varying from a low of about $5,500 for 1940 to a high of almost $32,000 for 1946. With one exception (1939), each return showed wagering income or "miscellaneous" income or both. For these years the reported wagering and miscellaneous income ranged from 47% to 115% of adjusted gross income, and for the 11 years in the aggregate wagering income constituted 49% and miscellaneous income 25% of that gross. The returns did not reveal the sources

of that income and details as to it were not given to the taxpayer's accountants.

*Beginning net worth.* Agent Kleven testified that he prepared the net worth statement as to Banks for December 31, 1936, and for the end of each of the calendar years 1937 to 1947, inclusive, which was used to support the deficiencies originally claimed by the Commissioner, and that he utilized Banks' 1937 affidavit in determining beginning net worth. The taxpayer stresses that this net worth statement was not contained in the statutory notice of deficiency or in the answer filed in the Tax Court and that it was not until December 31, 1958, more than six years after the issuance of the notice and just a few months before trial, that this statement was revealed by its appearance as an exhibit in the Commissioner's second amendment to his answer.

The Tax Court's opinion contains the net worth statement on which the Commissioner relied at the trial. It is based on the statement attached to the second amendment to the answer with adjustments to reflect subsequent pleadings, stipulations and concessions. It need not be set forth here. It suffices to note that it shows (a) almost 80 separate items of assets and liabilities; (b) a net worth on December 31, 1936, of over $23,-000 and on December 31, 1947, of over $349,000 (as contrasted with corresponding figures of approximately $18,500 and $323,000 used in the criminal proceedings; see p. 669 of 204 F.2d); (c) increases in net worth for each of the years; (d) net income, based upon this increase plus non-deductible living expenses and federal income taxes paid; and (e) the excess of the net over the amount reported by the taxpayer and his wife.

By the time the court took the case under advisement only 22 items in the statement remained in controversy. The taxpayer was claiming and asserting in addition, however, the benefit of having at the opening date (a) $60,000 cash on hand; (b) outstanding loans in excess of $245,000 and the repayment of the major portion thereof during the 11 taxable years in question; and (c) certain investments which were either sold or became worthless during those years.

The opinion also contains the court's own recomputation of net worth increases, net income, and net income excess. Specifically, the Tax Court (a) ruled in favor of the Commissioner on 20 of the 22 contested items; (b) ruled in favor of Banks on the other two; (c) accepted the taxpayer's contention as to $60,000 opening cash but found he also possessed the same amount throughout the net worth period; (d) found that none of the alleged loans ever existed or was repaid; (e) accepted the taxpayer's claim of an opening investment in Old Peoria Company; and (f) ruled against the taxpayer's claim of investments in other companies. The court also (a) held that the Commissioner properly used the net worth method; (b) ruled that the Commissioner had not failed to follow leads; (c) found that a part of the 1942–47 deficiencies was due to fraud; and (d) held that an addition to tax for underestimation for 1947 was proper.

On this appeal the taxpayer does not contest (a) the use of the net worth method; (b) directly, at least, its original claim of failure to follow leads; (c) the fraud determination per se; and (d) the underestimation determination per se. Correspondingly, the Commissioner has filed no petition to review the rejection of the two items proposed by him but decided in the taxpayer's favor. These are therefore not before us. Helvering v. Pfeiffer, 302 U.S. 247, 250–251, 58 S.Ct. 159, 82 L.Ed. 231 (1937); Frank v. Commissioner, 321 F.2d 143, 145 (8 Cir., 1963). The following, raised by the taxpayer, are at issue here:

1. Cities Service Company stock

2. E. A. Jefferds loan

3. Cash on hand in a constant amount throughout the net worth period

4. Loans receivable from Michael O'Connor, Herman Mitch, Michael

Code, Stanley Schultz, Theodore Brown, and James A. Carlson

5. Wheel Service Corporation investment

6. Farm items

7. Reliability of the Commissioner's net worth statement

8. Burden of proof.

We discuss these in order. In doing so we have in mind the following principles:

1. There is, of course, a presumption of correctness which attends the Commissioner's deficiency determinations and, apart from fraud, the taxpayer has the burden of proof. Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933); Schroeder v. Commissioner, 291 F.2d 649, 652 (8 Cir., 1961), cert. denied 368 U.S. 985, 82 S.Ct. 598, 7 L.Ed.2d 523; Marcella v. Commissioner, 222 F.2d 878, 881 (8 Cir., 1955).

2. The clearly erroneous standard applies to findings made by the Tax Court. Section 1141(a) of the 1939 Code; Section 7482(a) of the 1954 Code; Rule 52(a), F.R.Cr.P.; Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); Idol v. Commissioner, 319 F.2d 647 (8 Cir., 1963). If a finding is supported by substantial evidence on the record as a whole and is not against the clear weight of the evidence or induced by an erroneous view of the law, it is not to be disturbed on appeal. Schoenberg v. Commissioner, 302 F.2d 416, 419 (8 Cir., 1962).

3. Where evidence which is competent, relevant and credible is uncontradicted, the Tax Court may not arbitrarily discredit or disregard it. Gordon v. Commissioner, 268 F.2d 105, 107, (3 Cir., 1959); Tank v. Commissioner, 270 F.2d 477, 486–487 (6 Cir., 1959); A & A Tool & Supply Co. v. Commissioner, 182 F.2d 300, 304 (10 Cir., 1950).

4. But "the court is not bound to accept testimony at face value even when it is uncontroverted if it is improbable, unreasonable or questionable". Archer v. Commissioner, 227 F.2d 270, 273 (5 Cir., 1955); Commissioner of Internal Revenue v. Smith, 285 F.2d 91, 96 (5 Cir., 1960). The emphasis is on credibility. Thus, "Where under the record the court can fairly say that, because of interest of the witnesses or improbability of the testimony, the witnesses' testimony is not entitled to credit, the testimony may be disregarded." Cullers v. Commissioner, 237 F.2d 611, 615 (8 Cir., 1956); Weiss v. Commissioner, 221 F.2d 152, 156 (8 Cir., 1955); Rand v. Helvering, 77 F.2d 450, 451 (8 Cir., 1935).

5. Further, "All of the probative evidence—circumstances as well as direct testimony—necessarily is open to and should be considered by the Tax Court in resolving the factual probabilities of the situation * * *." Heil Beauty Supplies, Inc. v. Commissioner, 199 F.2d 193, 195 (8 Cir., 1952).

*The Cities Service Company stock.* Shares of Cities Service common were included in the Commissioner's net worth schedule and in the Tax Court's adjusted schedule throughout the entire 11 year period. In his opening statement at the trial counsel for the Commissioner conceded that this stock had been transferred out in 1941; in his brief here he also concedes that it should not be carried throughout the period. An adjustment for the Tax Court's inclusion of this item in net worth for December 31, 1941, and thereafter, must therefore be made.

*The Jefferds loan.* Listed in both the Commissioner's and the Tax Court's net worth schedules for December 31, 1943, and for the remaining portion of the net worth period is a $5,000 receivable from E. A. Jefferds. Banks testified that Jefferds was in the real estate business in Minneapolis and that he did not transfer $5,000 to Jefferds in June 1943, as the Commissioner contends. He did concede that he had made loans to Jefferds "many, many a time", usually for 30 days. However, on direct examination agent Kleven testified:

"Q. Now, Mr. Kleven, the next item of dispute on the net worth

statement is designated E. A. Jefferds and is listed as item 26–A, which you have shown in the figure of $5,000, starting in 1943, and following through the end of the period. Will you state the basis of that amount in your net worth statement?

"A. It was set up from information received by Mr. McKusick.

"Q. And you personally cannot testify with respect to that item?

"A. No, I cannot.

"Mr. Maun: I take it you have no knowledge of that item, Mr. Kleven?

"The Witness: Except from what Mr. McKusick has told me."

And on cross-examination:

"Q. Now, you got E. A. Jefferds in for $5,000 for five different years. December 31, 1943 to December 31, 1947. What evidence do you have in support of your inclusion of that item?

"A. Right now, I don't have much.

"Q. None whatever. And in your view that item should not be included, is that right?

"A. I would say so."

In his brief in the Tax Court the Commissioner conceded this item because of "failure of proof" and because the supporting evidence "consisted of an oral statement" to McKusick who had died prior to the trial.

The Tax Court, however, included the Jefferds item in its computations. It did so on the theory that the taxpayer had the burden of proof, that its inclusion was on the basis of information obtained by McKusick, and that Kleven's testimony was not binding on the Commissioner. It observed that Jefferds was not called as a witness and that his absence was not explained. It pointed out that the item was not a factor to be considered adverse to Banks as to fraud.

On this state of the record we resolve this issue in favor of the taxpayer. We may assume, for present purposes, that the witness Kleven did not have the power to bind the Commissioner. Nevertheless, we conclude that the taxpayer's burden as to this item was met. The Commissioner's only witness stated that he did not "have much" in support of the item's inclusion. Translated, this obviously meant that he had nothing at all. The item is thus supported only by the initial presumption of correctness and by the further presumption of adverseness claimed to be drawable from the taxpayer's failure to produce Jefferds. The issue could be close but in view of the Commissioner's concession in the Tax Court and the fact that the item admittedly rests on nothing more than an asserted oral statement of undescribed nature to a deceased revenue agent, we are not inclined to approve the Tax Court's sua sponte revival of the item. Wiget v. Becker, 84 F.2d 706, 710–711 (8 Cir., 1936); Andrews v. St. Louis Joint Stock Land Bank, 127 F.2d 799, 804 (8 Cir., 1942). See Weir v. Commissioner, 283 F.2d 675, 682 (6 Cir., 1960). We hold its inclusion in the net worth computations for 1943 and the years following to be error.

■ *Cash on hand.* The Commissioner in his net worth reconstruction made no allowance for cash on hand, other than certain bank deposits, at any time during the net worth period. By his amendment to the reply to the second amendment to the answer the taxpayer alleged that he had cash on hand at the beginning of the period, in the form of currency at home and in addition to bank accounts, in the amount of approximately $60,000. The Tax Court found that Banks did have cash in that amount on hand as of December 31, 1936, but, so far as the taxpayer is concerned, nullified this finding's effect by also finding that the $60,000 remained constant throughout the entire period. It did so "in the light of the needs of the types of business in which petitioner engaged". It felt, "from the nature of petitioner's business activities during the period in question", that this amount "was in the nature of a revolving 'bank roll' which

varied little during the period 1936 to 1947". It observed that Banks had offered no "acceptable evidence that he had less cash at the end of each year as the period progressed" and that it gave him the benefit of any doubt "because any variation would be reflected in an increase rather than a decrease".

On this appeal Banks does not attack the $60,000 beginning amount even though his own testimony during the trial, while containing a concession on cross-examination that he did not know, related itself to various higher figures. His attack is directed against the finding that the cash remained constant throughout the period. He argues that there is no evidence of constancy; that currency was used to purchase assets; that the Commissioner had determined that there was no cash at the end of the period; that the taxpayer was not obliged to disprove this; and that the court's finding of $60,000 at the end of the period is only a guess.

We affirm on this issue. There is evidence in the record—Banks' 1937 affidavit with its assertion of insolvency; Masica's testimony that Banks' attorney O'Gordon had told him that Banks would "try to borrow part of the money" to pay in 1937 the 1920–33 deficiency and arrange for the rest out of his salary; Mrs. Banks' borrowing $1,000 from a bank in 1933; Banks' making, on behalf of Flour City Body Corporation, of small bank loans from 1930 to 1933 secured by his life insurance; his making of an insurance loan of $1,500 in December 1932 and paying it off only in May 1941; his obtaining commercial mortgages of $4,000 and $5,000, respectively, on two Minneapolis residential properties in 1930 and 1933, with one of these becoming delinquent by 1935 and the other paid off only in 1944; his allowing two government life insurance policies to lapse in July 1934 for non-payment of premiums; his declaring small amounts, only once as much as $3,000, for Minnesota money and credits tax purposes from 1929 through 1936; Mrs. Banks' sworn application in January 1930 on behalf of her husband that he had no money on hand and for a reduction in money and credits valuation from $3,000 to $2,000 as of May 1, 1929; and the revenue agents' unsuccessful search for gift and inherited items—consistent, despite the pre-period dates of some of these, with a meagre supply of unrestricted cash and inconsistent, as the Tax Court observed, "with an individual claiming a substantial cash reserve". This indicates that any cash horde which Banks personally and separately maintained was the amount continuously required for his questionable operations. The inference as to a revolving fund required by the economic realities of his business activity was, in our opinion, a proper one for the Tax Court to draw. Indeed, we feel, as did the Tax Court, that Banks was given the benefit of any doubt here; a finding of more cash on hand in 1947 than in 1936 would not have been out of line with reality. See, generally, as to this, Bodoglau v. Commissioner, 230 F.2d 336 (7 Cir., 1956); Baumgardner v. Commissioner, 251 F.2d 311, 318 (9 Cir., 1957); Millikin v. Commissioner, 298 F.2d 830, 834–835 (4 Cir., 1962).

The taxpayer cites Gunn v. Commissioner, 247 F.2d 359 (8 Cir., 1957), where this court reversed the Tax Court with respect to a finding that a taxpayer had no cash on hand at the beginning of the period even though engaged in activities which obviously required a substantial amount of it. There we emphasized, 247 F.2d p. 362, "business or economic reality". We of course have no quarrel with our holding in the Gunn case. See Gunn v. United States, 283 F.2d 358 (8 Cir., 1960). It is, however, of no assistance to Banks. The Tax Court, despite the negative evidence we have just outlined, found that Banks, as he alleged, possessed $60,000 in cash and, as we have pointed out, its amount is not attacked by Banks on this appeal. The requirement of Gunn is therefore fulfilled. What stings is the finding of constant amount but that is not what Gunn was about.

Neither do we think Phillips' Estate v. Commissioner, 246 F.2d 209 (5 Cir.,

1957), also cited to us by the taxpayer, is inconsistent with our holding here. There the court held, 246 F.2d p. 214, that proof was "utterly lacking to support the prime assumption that the cash was the same at the beginning as it was at the end". As we have already indicated, we think that there is enough in the present record to support the Tax Court's finding of constancy and that that finding was not clearly erroneous. See Merritt v. Commissioner, 301 F.2d 484, 486–487 (5 Cir., 1962).

*The loans receivable.* This is the most important issue in the case if the amount of tax involved is any measure. O'Connor, Mitch, and Code, the three largest debtors, were deceased at the time of the trial.

a. The Michael O'Connor loans of $135,650. Banks' claim that this amount was due him from O'Connor at the beginning of the period rests upon his own testimony, that of his wife, that of Michael's brother Robert, and a 1937 calendar pad slip.

O'Connor's principal occupation was that of a gambler. Banks testified that O'Connor worked with him at times in the early 1920's, was a Dyckman hotel bell boy, and bought whiskey from him; that he was "a very dear friend"; that he never took a note or other formal evidence of indebtedness from him; that instead he and O'Connor each kept a separate notebook record of the loans until October 1937 when they had a dispute over a $10,000 difference; that taxpayer then prepared duplicate calendar pad slips listing the amounts due; that he retained one and gave the other to O'Connor; that the first loan he made to O'Connor was one for $5,000 in 1921; that Robert was present when some of the borrowings were made; that Banks had a floor safe in his home where money was kept and from which currency was taken and turned over to O'Connor; and that he gave his slip to Robert when O'Connor made his last payment.

Robert O'Connor supported much of Banks' testimony as to his financial relationship with Michael. He told of obtaining money from Banks for Michael or in company with Michael in the 20's and 30's when Michael required it for his cigar store or gambling operations; of his taking payments to Banks; of his being present when a final payment of $10,000 was made in November 1955; of his receiving the slip; and of his putting it in his billfold and keeping it therefor several years. Mrs. Banks also testified that loans were made to Michael and that she took money from the floor vault for this purpose when her husband asked her to do so and when Michael and Robert were present.

The calendar pad slip carries a notation, "Do Tom Jan. 1–1938 Mickey O'Connor Notes for $135,650.00". It shows repayment of varying amounts from December 1938 through November 1945. It is in Banks' writing.

b. The Herman Mitch loan of $31,000. Here Banks' claim rests upon his own testimony and another 1937 calendar pad slip. Banks testified that he first lent Mitch $5,000 in the early 20's and thereafter "Mitch began getting merchandise"; that he took no promissory notes from him; that Mitch "had a couple places that were going in St. Paul"; that the indebtedness was built up by cash and merchandise from 1921 to 1927 or 1928; that he made these successive advances even though Mitch had repaid nothing; that this was done mainly because of representations by his friend Fred Ullrich who stood behind Code; that "Mitch had a slip the same as the others"; that the slip was begun in January 1938 and its entries made on the several dates specified; that Mitch paid no interest; that he repaid a total of $13,000 at various times from 1941 through 1944; that Mitch had died; that at his death he still owed $18,000; and that Banks did not file a claim against Mitch's estate because Ullrich had guaranteed his loan, although Ullrich "had passed away several years previously", and because he did not think Mitch "had anything to speak of" and "I didn't bother about it".

Mitch's son testified that his father had always been in the liquor business; that he died in June 1948; that his father paid the son's tuition at St. Thomas College except for the last half year; and that the son paid this himself when he returned from service. Assets totalling about $7,400 were distributed from Mitch's estate. A claim for $67.81 for unpaid 1941 personal property taxes, interest and penalties was filed during the probate.

c. The Michael "Mitch" Code loan of $46,000. Banks testified that this obligation arose out of his leaving Code in charge of his alcohol inventory when Banks and his wife went to California in 1929; that Code was to have 50% of the profits; that there was no written agreement as to this; that while he was away Code gambled and drank and dissipated the inventory; that the loss was thus sustained; that a calendar pad slip for Code was also begun in January 1938; and that Code's last payment was one of $9,000 in July 1945 and "was paid to me at the Casanova Bar". The slip shows payments to Banks on five dates from August 1941 to July 1945. These total $45,000. Code died in December 1946. His estate had personal property of almost $18,000 for distribution. Banks did not file a claim for the $1,000 difference. The calendar pad slip carries the notation, "Squared off or if I should die Mitch will pay Reta the $1,000.00".

Deputy U. S. Marshal Murnane testified that he was in the Casanova Bar one night in the summer of 1945; that Tom Ewing, a proprietor, asked him to come to the office; that Ewing, Banks and Code were there; that "Ewing got a pile of bills out of the safe, the three of them were counting the bills"; that the room was very small and he stood in the doorway "as a sort of guard"; that part of the time he was outside the room; that he pulled the door to during this time; and that he did not know whose money it was or how much was counted or the purpose of counting it. On direct examination on behalf of the taxpayer Murnane was asked:

"Q. You didn't say what the conversation was. * * *

"A. There was considerable conversation about, that I heard, about you count this, I have a thousand in this pile, and then at the end, you are a thousand dollars short. That is what I remember of it."

On cross-examination:

"Q. Now, with respect to the remarks that you have said you overheard, can you state with certainty as to who made those remarks?

"A. No.

* * * * * *

"Q. Can you testify under oath as to what was happening at that time?

"A. Oh, no.

"Q. You don't know what the purpose of the counting of that money was for, do you?

"A. No."

The taxpayer argues that this corroborates the slip figures, is uncontroverted and unimpeached, and cannot be ignored. The Commissioner argues that it corroborates nothing.

d. The Stanley Schultz loan of $11,600. Banks testified that he loaned Schultz $6,000 and then $5,000 and bought him a car wholesale for $600, all prior to 1931; that Schultz was a bootlegger; and that $8,000 was repaid in late 1945 and the balance around 1948. Schultz testified that he became acquainted with Banks in the early 20's; that he bought alcohol and whiskey from him; that he borrowed $6,000 from Banks in 1929 and $5,000 in 1930 to pay off some gambling debts and to buy whiskey and alcohol; that Banks told him he advanced the $5,000 on condition he give up gambling; that he repaid $8,000 in December 1945 and the balance at the Dyckman Hotel in 1948; that he obtained the $8,000 from the sale of his Seattle tavern in 1945; that the last payment came in

part from the liquidation of another holding; that he hijacked a whiskey truck in 1936 and pleaded guilty to a charge in connection with it; and that in 1924 or 1925 he was convicted in North Dakota for transporting liquor. A revenue agent's report referred to the 1945 tavern sale. Revenue Agent Malone testified that a man named Bryant had told him that Schultz turned over his share of the liquidation to Banks. Bryant, a bartender, testified that he had been a part owner in the liquidated enterprise and that Schultz received his share at that time and immediately handed it over to Banks.

e. The Theodore Brown loan of $9,-250. The taxpayer's amended pleadings allege that Banks made a cash loan to Brown of $11,750 in 1931 and that Brown repaid $2,500 in 1935 and $9,250 in 1946. Banks testified that he met Brown in the early 20's when he had a hunting lodge in South Dakota; that he owed him $5,000 for merchandise purchases; that Brown wanted to buy a hotel in Miles City and borrowed $7,500; that he took no note from him; and that Brown paid back $2,500 or $3,000 first and later the full amount. Brown testified that he first met Banks at the lodge; that he bought alcohol and liquor from him; that his account with Banks varied; that he stopped selling alcohol in 1928 when he pleaded guilty to a federal charge and received a suspended sentence; that he then owed Banks $4,-749.59; that in 1926 he borrowed $7,500 from him to buy the hotel; that he repaid Banks $4,975 in 1929 when he sold the hotel and a balance of $9,000 in 1946. A mortgage on the hotel was satisfied of record at the time of the sale.

f. The James A. Carlson loan of $15,-000. Banks testified that Carlson had been his friend for years; that when prohibition ended he asked for help in getting a liquor license; that he lent him $15,000 in 1934; that he obtained a liquor store in Minneapolis; that Carlson went blind in 1937; that his wife continued to operate the store; that they finally went into bankruptcy; and that Carlson came to him at different times and repaid the loan. Carlson testified that he met Banks at his cigar store around 1920; that he acquired the liquor store in 1934; that for this he had some of his own money and borrowed $15,000 in cash from Banks; that he operated the store until January 1942 when it went into bankruptcy; that he paid back the $15,000 "right after New Year's in 1942"; that this money was at hand because he had saved on fixtures for the place and had about $8,000 of the original loan left; that Banks had always been nice to him and bought a seeing eye dog for him; that Banks had loaned him $3,000 in 1930 which he paid back; that he executed no note for the $15,000 and paid Banks no interest; that returns filed for the liquor store for 1940 and 1941 showed losses; that when his father died in 1943 he inherited a house, sold it, and lived on the proceeds of that sale; and that his wife also went to work at that time. The records of the Minnesota District Director of Internal Revenue show that Carlson filed no individual income tax returns for the years 1937 to 1947.

Robert G. Kinsey, an accountant who prepared returns for Banks for 1934–41 and who did some work for him in connection with the 1920–33 investigation, testified that "I know that people owed him money", that Banks told him of some repayments and that among the debtors were Carlson, O'Connor and Code. Weinstock testified that when he made out Banks' return for 1942 the taxpayer told him that he "had considerable money loaned out and was getting repayments of this money", that he went into no detail, and that Weinstock told this to McKusick in 1950. Banks himself testified that he told Kinsey about the loans in 1936 or 1937; that he told Weinstock about them; that Mrs. Banks "knew a little about them, not too much"; that he told accountant Zimmerman about them just before the criminal trial started; and that he told attorneys O'Gordon, Cary and Graff. The Tax Court rejected the taxpayer's offer of proof of

the transcript of the allocution in June 1952 following the criminal trial. There Banks had stated to the court that at no time during the investigation was he asked about "accounts receivable".

The Tax Court refused to recognize any of these loans in the net worth computations. It concluded that Banks' testimony was unworthy of belief; that Mrs. Banks was obviously biased and willing to testify to anything she thought might be helpful to her husband; that, to the extent testimony of others tended to corroborate that of Banks, that testimony also was not credible; that the calendar slips were fabricated; and that the loans had not been made.

We cannot say that the Tax Court's conclusions as to these asserted obligations were clearly erroneous and that they have no adequate basis in the record. As factors bearing upon all the loans we note that (a) Banks, as the Commissioner describes him in his brief, "is a three-time convicted felon"; (b) his case is dependent upon the falsity of his own 1937 affidavit presented for federal tax purposes; (c) the affidavit asserted insolvency at a time when, it is now claimed, all these loans existed and yet it failed to mention any of them; (d) the taxpayer made his living primarily from bootlegging, gambling and illegal and hazardous activity; (e) the loans were substantial and in cash and yet bore no interest and were not formally evidenced; (f) Banks' acknowledgment that his cash horde was the result of his efforts and risks in bootlegging and alcohol and was a "very tangible worthwhile possession" and "was everything" to him; (g) his concession that he did take notes for "small loans to people that I wasn't very close to", that is, loans around $2,500, but none from "dear friends"; (h) his nonetheless taking a $3,000 note from the same Michael O'Connor, the year before O'Connor died; (i) the absence of the debtor's handwriting on each of the three slips; (j) Banks' filing of a claim against O'Connor's estate for the $3,000 loan, as contrasted with his failure to file his claim for $18,000 not evidenced by a note against Mitch's estate; (k) the informality attached to these loans despite Banks' obvious business shrewdness and awareness; (l) the non-appearance of accounts receivable in the investigation of 1920–33; and (m) the general absence of comment about receivables in the investigatory period of the present case.

Specifically, with respect to the witnesses other than the taxpayer, we may point out (1) as to Mrs. Banks, that (a) her claims of independent ownership of investments do not agree with their treatment on her and Banks' separate income tax returns, (b) she allowed herself to be used as a convenient front for Banks on various occasions, and (c) she had something to do with the cash horde in the floor vault in their home for it was she who often obtained money from it upon her husband's request; (2) as to Robert O'Connor, that (a) he did no work until 1937 when Michael employed him to deal blackjack, (b) he was a cigar store doorman in 1946 charged with the duty of keeping strangers out because bets were being booked there, (c) he admitted excessive drinking until 1922, in 1934 or 1935, in 1938, and in 1940 for two and a half years, (d) he kept Michael's calendar pad slip in his billfold for years, even though it did not concern him and was something between Michael and Banks, "just for a joke and to kid about it", and (e) his testimony was contradicted in various respects by special agent Malone, by accountant Steenerson, and by a salesman as to whether he was asked by O'Connor to call Banks to approve a clothing purchase; (3) as to Schultz, that (a) he had been a bootlegger and a convicted one, (b) he had been convicted and served time for truck hijacking, and (c) he was a gambler; (4) as to Brown, that (a) his testimony and that of Banks differed substantially with respect to dates and amounts and both differed from the allegations of the pleadings, and (b) he, too, was a convicted bootlegger; and (5) as to Carlson, that he stated that he repaid Banks his $15,000 loan right at

the time the petition in bankruptcy was filed for his store.

Also, with respect to certain of these obligors, we note (a) Mitch's failure to make the last payment on his son's college education; (b) his nonpayment of even the small personal property tax delinquent at his death; (c) the testimony of Otto Siems, O'Connor's partner in the Mill Pond Trout Club, a liquor and gambling establishment in Shakopee, Minnesota, to the effect that O'Connor had no money, made his down payment in the business with equipment, and paid off the balance from the earnings of the business, as contrasted with Banks' testimony that he loaned Michael $25,000 to buy an interest in that club; (d) the absence of any record of the cost of the alcohol which Code was said to have dissipated and which formed the major portion of that receivable; (e) the net income reported by Michael O'Connor on his returns for the eleven years 1937–47, inclusive, totalling less than $90,000, an average of only about $8,000 a year, whereas Banks asserts the repayment of over $135,000 from O'Connor from 1938 through 1945; (f) the net income reported by Mitch for the same years totalling below $35,000, an average of less than $3,400 a year, although Banks claims repayments of $13,000 from Mitch from 1941 to 1944; and (g) the net income reported by Code for 1937–1946, totalling less than $40,000, an average of under $4,000 a year, although Banks asserts repayments of $45,000 from Code from 1941 to 1945.

It is true that the taxpayer introduced or presented in evidence (a) a November 1946 satisfaction of a Brown mortgage on South Dakota property; (b) Carlson's application for the Minneapolis off sale liquor license; (c) a revenue agent's report making adjustments in Schultz' 1945 tax in part occasioned by the sale of a Seattle tavern; (d) testimony of Zimmerman to the effect that he saw the Banks-Code and the Banks-Mitch loan slips in his first consultation with Banks in late 1951 or early 1952, that the debts are reflected in a net worth statement

he prepared for the criminal trial, and that he prepared other statements after the trial which contained certain of these receivables; (e) testimony of Richard G. Bowen, an examiner of questioned documents, that he examined the three calendar pad slips and was of the opinion that the handwriting on them was by the same person, that there was no evidence of erasure, fraud, interlineation, or change, that the slips came from the same pad, that on one slip the notations were made at two different times, that of those on the others most were made at different times, and that he could give no opinion as to the age of the ink; and (f) the Murnane testimony.

It is obvious, however, that all this evidence by no means constitutes convincing proof of the existence of these loans. It does no more than tend to establish isolated facts the respective witnesses asserted. It does not substantiate their stories in the aggregate. For example, Zimmerman's testimony that he saw the slips just prior to the trial of the criminal case tends to deny that the slips were made or prepared for the present civil case. And their being on the back of 1937 calendar pad slips tends to relate them to that period rather than to a later date. On cross-examination, however, Bowen acknowledged that it was possible that the slips could have been made up in 1951 or 1952, even though they were on 1937 slips, and that he could not say with certainty that the writing on the slips was not all made at one time.

We have taken due notice, too, of the taxpayer's arguments (a) that the fact Zimmerman's net worth statement was not presented at the criminal trial is not in itself justification for treating the loans as non-existent; (b) that the Commissioner introduced no evidence that the returns of O'Connor, a gambler, were ever examined for accuracy although Siems testified that O'Connor received Mill Pond wages and profits of $20 a day plus over $10,000 a year from 1936 to 1941; (c) that when written evidence was presented as to the three large loans, namely, the calendar pad slips, it was

tossed aside as fabricated, whereas comment was made by the Tax Court as to the absence of written evidence of the three smaller loans; (d) that although the Tax Court said that no suggestion of the loans appeared until 1958, the same could be said as to Banks' cash and other assets which were found to exist; (e) that the existence of the loans for many years is shown by the testimony of Kinsey, Weinstock and Banks; (f) that the Tax Court's intimation of belated disclosure by the taxpayer is absurd in the light of the Commissioner's own six and one-half year delay in disclosing his net worth statement; (g) that invitations were extended in 1952 to the Internal Revenue Service to examine the taxpayer's civil liability and a response to these would have led to knowledge of the loans; (h) that the debtors' repayments were not necessarily made out of taxable income and, anyway, the income they reported may well have been understated; (i) that accountant Steenerson misstated the initial date of federal withholding; and (j) that Brown's testimony, if he really wished to perjure himself, could have been prepared to avoid the confusion apparent in it.

■ What all this amounts to is that the evidence was in the common state of some conflict. The arguments are primarily and appropriately directed to the trier of fact. That trier in this case was the tax court judge who had the opportunity of observing the witnesses and their demeanor on the stand. He was not convinced by the arguments. It is not for this reviewing court to retry the factual aspects of these obligations.

Of course, the facts that a man is engaged in nefarious businesses and that what fortune he has was accumulated through unlawful activity do not of themselves necessarily mean that obligations cannot be due to him or that he is not entitled to such tax benefit as the Congress has seen fit to provide. Our problem, however, is one of proof and here it is particularly one of credibility. The activities Banks chose to pursue for his living, his associates, his habit of usually doing business outside normal commercial channels, his almost complete lack of supporting records, his admitted unconcern with the truth and with the law —all entail the risk of incredibility. This risk he takes. He lost that gamble. We find no unreasonableness in that result.

■ *Wheel Service Corporation stock.* The Tax Court's net worth schedule included this stock at the beginning of the period at a figure of $4,500. Banks asserts that his tax basis in the stock was $12,077.13 as of December 31, 1936, and that this is the figure which should be employed. The $4,500 amount appears in the 1937 affidavit. The Tax Court used the affidavit figure and observed that that amount "is corroborated by a transcript of the records of the company".

It was stipulated that company books could not be found at the time of the trial and that the corporation was dissolved in 1944. Agent Masica testified that in his investigation for 1920–33 he prepared a memorandum from information given him by Kinsey or from the Wheel Service books Kinsey showed him and that this disclosed an investment of $4,600 evidently as of January 1, 1933. Kinsey testified that he kept the books of Wheel Service from July 1931 to 1940; that he prepared an amended federal return for Banks for 1940 to which work papers were attached; that those papers contained a transcript of the ledger account showing cash advances by Banks to the corporation; that these totaled $10,377.73 "and I understood he paid Mr. Wickers $1,700"; that "we got the cash book and we saw the money go into the bank"; and that he could not give the December 31, 1936, figure exactly because he could not separate 1936 and 1937. He also acknowledged that in 1937 he had stated to Masica that Banks "didn't appear to have very much * * * interest in * * * Wheel Service * * * I didn't consider that it was a very large amount". There was an

office audit of the taxpayer's 1940 return. That return referred to a basis of over $12,000 in the stock. The audit proposed a small additional tax due to minor adjustments other than Wheel Service.

Banks argues that the transcriber of the company's records, the return that was prepared, and the examining agent all concluded that the basis was the proper figure; that the Tax Court erred in relying on Masica's figures which were from 1933 rather than from 1936; that even then it was $4,600 and not $4,500; and that the court thus showed careless disregard of the taxpayer's rights.

We are not convinced.· We cannot find as clearly erroneous the Tax Court's utilization of the very figure Banks chose to employ in his 1937 affidavit where that figure is substantially corroborated by Masica's investigation, despite the $100 and the four years' difference. That the office audit of the 1940 return made no change in the asserted basis or even any reference to it is not persuasive. The agent making the audit testified that he did not leave his office while making it; that "it was a telephone conversation undoubtedly"; and that he did not examine any books. This hardly constitutes Service investigation and specific approval of the investment now claimed by the taxpayer.

*Farm items.* Two errors are· asserted here. The first is that the Commissioner and the Tax Court, for 1941 through 1947, improperly used market value of farm inventories rather than their lower cost. The second is that there was prejudicial failure to reflect capital gain treatment allowable for breeding animals. The Commissioner's farm inventory valuations were taken from the taxpayer's federal returns which recited that the inventories were based on the accrual method of accounting.

a. On the first issue the taxpayer argues that in a net worth case only cost is material. He cites Mertens, Law of Federal Income Taxation, Volume 10, § 55.19 (Cum.Supp.) and Schultz v. Commissioner, 278 F.2d 927 (5 Cir., 1960). The point is not won so simply. The net worth approach is not a method of accounting. Holland v. United States, supra, p. 131 of 348 U.S., p. 133 of 75 S.Ct., 99 L.Ed. 150. It is only a technique which utilizes circumstantial evidence for arriving at realized income. Banks v. United States, supra, p. 888 of 223 F.2d. Here we have a situation where the taxpayer consistently used the accrual method for the farm. That election had been made. It could not be changed without the Commissioner's consent. United States v. Ekberg, 291 F.2d 913, 924–925 (8 Cir., 1961), cert. denied 368 U.S. 920, 82 S.Ct. 242, 7 L. Ed.2d 135; Regs. 111, § 29.22(c)–6. See Frost v. Commissioner, 28 T.C. 1118, 1120 (1957); SoRelle v. Commissioner, 22 T.C. 459, 469 (1954). What the Commissioner has done here is to use the taxpayer's own figures and his own system from his own returns. Over the years involved such consistent use reflects income. The fact that, viewing the farms in isolation, this device for determining income may be different from that employed with respect to other assets is not a prejudicial accounting inconsistency. It is income which is important. Bennett v. Commissioner, 30 T.C. 114, 121 (1958). We regard this method of ascertaining this ·segment of this taxpayer's income as reliable and its use to be entirely appropriate.

b. On the second issue the taxpayer argues that the result of the Commissioner's approach is to tax at ordinary rates breeding animal gains which are entitled to capital gain treatment, citing Albright v. United States, 173 F.2d 339 (8 Cir., 1949); Scofield v. Lewis, 251 F. 2d 128 (5 Cir., 1958), and other cases, and that Banks is in the same position as the taxpayer in the Lewis case.

We pass the fact that this particular argument may not have been presented to the Tax Court. We note, for what it is worth, that the Lewis and other cited cases, together with the history of the

breeding animal provisions of the statute and the regulations were all reviewed, rather carefully and in detail we thought, by this court in Ekberg; that we there observed the Fifth Circuit's own sharp restriction of the Lewis case in Carter v. Commissioner, 257 F.2d 595, 600–601 (1958); and that we ourselves viewed Lewis most limitedly.

Here again the complete answer, in any event, to the taxpayer's contentions is his utter lack of records with respect to breeding animals. There are no farm schedule details after 1943. No breeding stock capital gains were ever claimed on the returns although animals apparently were sold. Weinstock could not identify the sales of breeding animals. Mrs. Banks could not recall how many were bought and how many were raised. When an animal was sold the only information she gave Weinstock was the sales slip showing weight and sales price. Capital gain treatment is hardly available to a taxpayer whose records do not disclose the necessary facts.

 *Reliability of the Commissioner's net worth statement and the burden of proof.* As the taxpayer points out, an essential condition in a net worth case "is the establishment, with reasonable certainty, of an opening net worth * * *. The importance of accuracy in this figure is immediately apparent * * *." Holland v. United States, supra, p. 132 of 348 U.S., p. 133 of 75 S. Ct., 99 L.Ed. 150. He argues that, although the Commissioner's opening statement was claimed to be based on Banks' 1937 affidavit, the Commissioner relied on it only when it was of advantage to him to do so; that in most instances the figures in the affidavit and those in the opening statement were not the same; that its inaccuracies and omissions reveal an arbitrary approach; that the absence of opening cash was incredible; that the omission of the Old Peoria stock and of Hungry Jack Lodge and the farm inventory errors illustrate the inaccuracies and unreliability; that the findings reflect bias against Banks, dis-

regard of his rights, and "distortion of the record"; that the Commissioner's determination was arbitrary and was so shown; that the burden of proof as to the actual amount of deficiency, if any, was upon the Commissioner and not upon the taxpayer, citing Helvering v. Taylor, 293 U.S. 507, 515, 55 S.Ct. 287, 79 L. Ed. 623 (1935); Harp v. Commissioner, 263 F.2d 139, 141 (6 Cir., 1959), and other cases; that that burden was not sustained; that Banks was not required to prove what tax, if any, was due; that there were a minimum of 58 differences between the original net worth statement and the Tax Court's own determinations; and that when a taxpayer shows a net worth statement to be erroneous the Commissioner must furnish evidence in support of every item in that statement.

 The situation for several reasons is not that convenient. First, we mention again what was observed near the beginning of this already too lengthy opinion, that three-fourths of this taxpayer's total reported income for the years in question consisted of vaguely described wagering and miscellaneous items; that Banks maintained no income records; and that his advisers "all told me that I should keep better books", and that "I have no answer for that. I just didn't do it". We are not to hold that "skillful concealment is an invincible barrier to proof". United States v. Johnson, 319 U.S. 503, 518, 63 S.Ct. 1233, 1240, 87 L.Ed. 1546 (1943); Holland v. United States, supra, p. 131 of 348 U.S., p. 133 of 75 S.Ct., 99 L.Ed. 150. Secondly, the use of the net worth method is not itself challenged by the taxpayer and, indeed, was expressly approved by this court in the criminal proceedings. Thirdly, there can be no prejudice to the taxpayer in the Tax Court's recognition, contrary to the Commissioner's statement, of cash and of investments in Old Peoria and in Hungry Jack. The Old Peoria stock, incidentally, was carried, not in the taxpayer's name, but in that of A. M. Cary, a fact which lends little

weight to a claim of arbitrariness on the part of the Commissioner. Fourthly, the taxpayer's burden of proof with respect to the presumption of correctness of the deficiency determination does not shift merely because there is some error in the Commissioner's statement. Anderson v. Commissioner, 250 F.2d 242, 246 (5 Cir., 1957), cert. denied 356 U.S. 950, 78 S.Ct. 915, 2 L.Ed.2d 844; Hoffman v. Commissioner, 298 F.2d 784, 788 (3 Cir., 1962). And testimony by a taxpayer or a witness whom the court finds unworthy of belief does not overcome the presumption of correctness. Commissioner v. Smith, supra, p. 96 of 285 F. 2d.

Lastly, the taxpayer's claim of a minimum of 58 differences deserves analysis before it is taken at face value. One number is given for each year of the schedule and thus any one error may be magnified several times in enumeration. Further, of the 58 items, 36 were stipulated to or conceded before the submission of briefs to the Tax Court and 8 had to do with the claimed $60,000 in cash.

The taxpayer in our opinion has not demonstrated pervasive error and arbitrariness of the kind present in Helvering v. Taylor and Gunn v. Commissioner, both supra. Everyone here is engaged in a search for truth. This is not a game which the taxpayer plays with the Commissioner. Some error in any net worth construction is perhaps to be expected. It is only a "reasonable certainty" which is required by Holland and its companion cases. We are fully satisfied that there was reasonable certainty here; that the opening net worth statement was not prejudicial or arbitrary; and that, apart from fraud, the burden of proof remained with the taxpayer.

The case is remanded to the Tax Court for recomputation of the deficiency and additions occasioned by the elimination of the Cities Service and Jefferds items. In all other respects the decision of the Tax Court is affirmed.