ALBERT R. SAMSA, JR. AND MICHAEL D. SAMSA, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Samsa v. Commissioner
Docket No. 4660-79.
United States Tax Court
T.C. Memo 1981-517; 1981 Tax Ct. Memo LEXIS 229; 42 T.C.M. (CCH) 1101; T.C.M. (RIA) 81517; September 16, 1981. Albert R. Samsa, Jr. and Michael D. Samsa, pro se. Wayne R. Appleman, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined the following deficiencies: Petitioner
Year
Deficiency
Albert R. Samsa, Jr
1976
$ 4,595
Michael D. Samsa
1976
4,980
The sole issue for decision is whether petitioners are entitled to claimed theft losses of $ 14,900 each. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. *230 Albert R. Samsa, Jr. and Michael D. Samsa are brothers and resided in Fairbanks, Alaska, when they filed their petition. On December 25, 1976, petitioners reported an armed robbery to the Alaska State Troopers ("AST"). Dan Decker was the first trooper to respond to petitioners' report. When Decker arrived, petitioners gave him a sketchy description of events which they claimed had just happened in their home. The following is a synopsis of petitioners' description of the robbery: Two men entered petitioners' home and forced them at gunpoint to lie face down on their living room floor. One of the intruders checked the remainder of the house, presumably to determine whether anyone else was there. This intruder then began tearing apart one of the bedrooms. Finding nothing, he returned to the living room and demanded to know where "the money" was. Petitioners denied knowledge of any money, and the intruder returned to one of the bed-rooms where he found petitioners' strong box. The intruders found the key to the strong box, opened it, and removed $ 30,000 cash. [1] Petitioners were then forced into their bathroom, and told not to come out. After a while petitioners believed *231 it was safe to leave, but were unable to leave through the door because the intruders had jammed it shut. Michael then crawled through the bathroom window, jumped onto petitioners' porch, and went around to let Albert out. When Decker learned of the amount of money involved, he requested additional supervisory help. *232 The AST dispatcher in Fairbanks sent Investigator John P. Addis to petitioners' home. While waiting for Addis, Decker continued his investigation. He examined the bathroom, the bathroom window, and the porch area outside the window. Decker was immediately struck by the fact that there were no footprints on the snow-covered portion of the porch near the window. [2]
When Addis arrived, Decker directed him to the porch area pointing out the lack of tracks in the snow. Based on Decker's report, an examination of the scene, and a conversation with one of the petitioners, Addis decided to take petitioners back to AST headquarters for further questioning. Petitioners were detained for several hours during which Addis questioned them separately. During this period, Addis sent Decker back to the house with Michael. Decker asked Michael to once again crawl through the bathroom window in the exact manner he *233 did after the robbery. This time Michael left clear footprints in the snow when he jumped. Addis eventually closed petitioners' case concluding that their report of an armed robbery was false. Addis based his conclusion on numerous discrepancies in petitioners' stories and on several conflicts between petitioners' statements and the actual physical evidence, such as: (1) the lack of footprints on the porch in the area of the bathroom window; (2) petitioners' conflicting statements that the intruders spoke with a southern accent and that they spoke without an accent; (3) discrepancies in petitioners' statements regarding the denominations of the bills taken; (4) Albert's statement that he did not get a good look at the intruders and his later statement that one of them had brown eyes; and (5) discrepancies in petitioners' statements regarding whether Albert helped Michael open the bathroom window. After being released from the police station, petitioners returned to their home and took photographs of various areas. One photo shows that two jars of money were left in plain view on a dresser in one of the bedrooms allegedly ransacked by the robbers. On their individual 1976 income *234 tax returns each petitioner claimed a theft loss of $ 15,000 (less the $ 100 minimum for a deductible loss of $ 14,900). In his notices of deficiency respondent disallowed these claimed theft losses. OPINION The sole issue for decision is whether each petitioner is entitled to deduct $ 14,900 as a theft loss incurred as the result of an armed robbery occurring on December 25, 1976. Section 165(a) [3] allows as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. Section 165(c) limits such a loss deduction in the case of an individual to "losses of property not connected with a trade or business, if such losses arise from * * * theft." The burden of establishing both the existence and amount of a theft is on the taxpayer. Rule 142(a), Tax Court Rules of Practice and Procedure.[4] See also Estate of Bryan v. Commissioner, 74 T.C. 725, 727 (1980). The only evidence in the present case supporting petitioners' claimed loss deductions is their own uncorroborated testimony. While a taxpayer's testimony *235 might well be sufficient to prove his entitlement to a deduction, it need not be accepted where it is "improbable, unreasonable or questionable." Banks v. Commissioner, 322 F. 2d 530, 537 (8th Cir. 1963). In the present case petitioners' testimony was not credible. Their explanation of events did not convince us that a robbery actually took place, let alone that the amount stolen was $ 30,000. Investigator Addis and Trooper Decker, on the other hand, appeared entirely credible. Their investigations revealed numerous unexplained conflicts in petitioners' stories. We concur in Addis' conclusion that petitioners' report of an armed robbery was false. Addis is an investigator trained to solve robberies such as the one petitioners allege took place in their residence. Upon arriving at the scene Addis immediately began to question whether any crime had actually taken place. Further investigation of the premises, a reenactment of Michael's supposed escape, plus separate questioning of petitioners ultimately convinced *236 Addis that no robbery occurred. Petitioners have presented us with no additional evidence supporting their story. Moreover, petitioners' own photograph reveals two jars of money in plain sight which were left undisturbed by the robbers. Their distrust of banks is questionable in light of their use of banks for checking accounts and a credit union for deposits of savings and to borrow funds. Finally, petitioners never explained why they needed to borrow money when they supposedly had $ 30,000 buried in their backyard. Upon a weighing of all the evidence in this case, and taking into consideration petitioners' demeanor at trial, we conclude that no robbery took place on the night of December 25, 1976. Accordingly, petitioners are not entitled to their claimed theft loss deductions. Decision will be entered for the respondent. Footnotes
1. Albert testified that he and Michael worked on the Alaska pipeline from 1974 through 1976, during which time they had periodically taken equal sums of money and stored it in box buried behind their house. Sometime around September or October of 1976, petitioners allegedly dug up the box because they intended to purchase some stock. Albert further testified that they kept this large sum of money in cash because they had had trouble with banks in the past and because they didn't believe in banks. However, in 1976 Albert and Michael borrowed $ 1,600 and $ 500, respectively, from the Wien Employees Federal Credit Union, and both had share accounts with the credit union. Moreover, during 1976 both petitioners had checking accounts with the First National Bank of Fairbanks, and Michael had an additional checking account with the Alaska National Bank of the North.↩
2. Although there was a small strip (approximately 6 to 8 inches wide) between the house and the snow line on the patio, it is highly unlikely that a person could have crawled out the bathroom window and landed on the porch without making any noticeable footprints in the snow.↩
3. All statutory references are to the Internal Revenue Code of 1954, as in effect during the year in issue.↩
4. See Capalbo v. Commissioner, T.C. Memo. 1977-412 (1977); Eaton v. Commissioner, T.C. Memo. 1977-79↩ (1977).