Abraham J. GORDON
and
Ruth F. Gordon, Petitioners,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

No. 12821.

United States Court of Appeals
Third Circuit.

Argued April 20, 1959.

Decided June 29, 1959.

Louis J. Finger, Wilmington, Del. (Aaron Finger, Wilmington, Del., on the brief), for petitioners.

Charles B. E. Freeman, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Attorneys, Department of Justice, Washington, D. C., on the brief), for respondent.

Before MARIS, GOODRICH and HASTIE, Circuit Judges.

MARIS, Circuit Judge.

This is a petition to review a decision of the Tax Court. Petitioners are, and were during 1952, the taxable year involved, husband and wife and filed a joint income tax return for that year.

Prior to 1951, petitioners lived in New York where Gordon operated a printing plant and also had engaged in the sale of plastic products. About 1950, Gordon became interested in a method for the manufacture of plastic molding compounds known as urea formaldehyde molding compounds. The method was radically different from conventional manufacturing methods then in use. Urea and paraformaldehyde were the basic materials to be used, and the proposed method of manufacture was supposed to dispense with the need for certain expensive items of equipment used in conventional manufacturing methods of the material, with costs supposed to be far below those under the conventional manufacturing methods. One of the factors inducing Gordon to go into the business was the fact that the demand at that time for urea formaldehyde molding compounds was so great that manufacturers were rationing their products among their customers, and requiring them to wait twelve to sixteen weeks for deliveries.

Gordon's previous business had been conducted as a proprietorship and he therefore first considered operating this enterprise in the same manner. However, after conferring with friends and upon the advice of counsel, Gordon decided that in view of the hazardous nature of the proposed new manufacturing operation, he would form a corporation to conduct the manufacturing operation. Accordingly, in April 1951, before the business began, Gordon Chemicals, Inc., a Delaware corporation, was formed, and a selling organization was set up by Gordon individually under the name Gordon Chemical Co. The corporation was created to engage merely in manufacturing the material and selling its output to Gordon and Gordon was to develop a market for the product and sell the same to the trade.

Gordon's estimate of the corporation's capital requirements was $35,000 or $40,000. His entire resources amounted to $20,000, all of which he invested in capital stock of the corporation. He arranged to borrow the additional estimated funds and to lend that borrowed money to the corporation.

On April 28, 1951 the corporation and Gordon entered into a written contract whereby the corporation agreed to sell its entire output to Gordon at 107% of the corporation's manufacturing costs, the amount of those costs to be determined as set forth in the contract. This price was to be paid monthly on an estimated basis and within three months after the end of each calendar year the exact amount payable by Gordon in respect to purchases during the preceding year was to be computed, and the account settled between the corporation and Gordon. Under the contract Gordon assumed all financial and other responsibility for sales.

From the time the corporation and Gordon began business, and throughout the year 1952, both the corporation and Gordon functioned in accordance with the contract. Each had separate books of account. The books were kept by an accountant who was engaged on a part-time basis. The accountant was given a copy of the contract between the corporation and Gordon and he was instructed to keep the records in accordance with the contract.

Due to delays in delivery of certain portions of the equipment, the corporation did not begin operations for a number of months after the contract was

signed. During the period of delay deliveries were made to the corporation of certain basic materials which had been ordered some time before, and those materials were stock-piled. Gordon borrowed money and loaned it to the corporation to enable payment to be made for those purchases. It was expected that these loans would be repaid within a short time. However, the corporation experienced unanticipated difficulties in making the new method work. Substantial additional amounts of money were found to be needed. When, finally, salable material was developed about the middle of 1952 the manufacturing costs were found to be higher than had been estimated, because the equipment did not perform with the anticipated efficiency.

The material manufactured and sold to Gordon during the second half of 1952 was marketed by Gordon for the total sum of $9,969.25, against which $2,219.-95 was deducted for material returned and other credits in connection therewith, leaving net sales by Gordon of $7,749.30. His expenses for the year were $305.34, and discounts allowed to customers totalled $71.45.

The corporation's books show periodical debits during the year for sales to Gordon in the total amount of $9,969.25, and credits for merchandise returned of $2,219.95, and also an additional debit to Gordon in December of $21,720.93, explained on the corporation's books as follows: "This adj. to bring sales in line with contract".

The purchases account in the books of Gordon show, similarly, a December debit in the amount of $21,720.93, which entry, along with the other debits, was duly entered on the accounts payable.

The corporation's books also show credits to Gordon during 1952 amounting to about $3,000.00 on the amounts owed to the corporation for products purchased from it, so that, at the close of 1952, the books of the corporation showed an account receivable from Gordon of $25,-904.23. Correspondingly, the books of Gordon showed the same amount owing by him to the corporation as an account payable.

By the end of 1952 Gordon had loaned $92,000.00 to the corporation, all but $3,000 of which had been borrowed by Gordon; and the respective payable and receivable accounts of the corporation and Gordon reflected this $92,000 of indebtedness from the corporation to Gordon.

In the petitioners' income tax return for 1952 Gordon deducted $22,097.72 as a loss sustained by him on the sale of products purchased by him from the corporation. He computed his loss as follows:

| | | |
|---|---|---|
| Price of products purchased from corporation | | $29,470.23 |
| Selling expenses | | 305.34 |
| | Total | $29,775.57 |
| Less sales | | 7,677.85 |
| | Loss | $22,097.72 |

The Commissioner disallowed the deduction. The Tax Court sustained the Commissioner's determination, holding that the petitioners had failed to establish that a loss of $22,097.72, or any other amount, was sustained by Gordon in 1952 in the conduct of his sales business.

■ In so holding, we think that the Tax Court arbitrarily disregarded unchallenged, competent and relevant evidence in the record which was inherently credible. Its decision must accordingly be reversed. Nichols v. Commissioner of Internal Revenue, 3 Cir., 1930, 44 F.2d 157; Whitney v. Commissioner of Internal Revenue, 3 Cir., 1934, 73 F. 2d 589; A. & A. Tool & Supply Co. v. Commissioner of Internal Revenue, 10 Cir., 1950, 182 F.2d 300, 304; Ansley v. Commissioner of Internal Revenue, 3 Cir., 1954, 217 F.2d 252, 257.

Paragraph 3 [1] of the agreement of April 28, 1951 between the corporation

---

1. Paragraph (3) of the agreement provides:

"(3) The price to be paid by Gordon for his purchases from the Corporation

and Gordon provided in detail for the price to be paid by Gordon to the corporation, for the manner of computing the price and for the manner of payment. It is quite clear under the terms of that paragraph that the amount due by Gordon to the corporation on account of his purchases was to be estimated currently and that later, within three months after the end of the calendar year, it was to be adjusted so as to reflect the exact cost plus 7%, the amount which was agreed to be paid under the contract. The uncontradicted evidence shows that this was exactly what was done by the parties in 1952. The price to be charged by the corporation to Gordon for the net sales made to him during that year was estimated at a total of $7,749.30 [2] and subsequently at the end of the year a charge of $21,720.93 was made by the corporation against Gordon as an adjusting entry to bring the sales to him in line with the contract, i. e., to reflect the difference between the actual cost of the products sold plus 7% and the sale price previously estimated as amounting to $7,749.30. This is clearly shown by the summaries from the books of both the corporation and Gordon which were stipulated in evidence and which were in no way impeached or even challenged by any evidence produced by the Government.

As we have seen, however, the Tax Court refused to accept this uncontradicted unchallenged evidence. Its refusal appears to be predicated upon several grounds. The first is that the adjusting entry of $21,720.93 made in December, 1952, was not supported by evidence of the underlying computations or data upon which it was based. Such supporting evidence was quite unnecessary, however, in view of the fact that the existence of the entry itself in the books was stipulated and that its correctness was in no way challenged or attacked by the Government's evidence. Indeed, the stipulation of this and other book entries was made at the instance of the trial judge after the petitioners had come into court with their accountant and their books prepared to testify in detail with respect to them. If there had been a suggestion by the Government at the trial, which there was not, that the stipulated book entries were insufficient to show the corporation's cost the petitioners were ready to produce the underlying data. Compare Rowland v. Boyle, 1917, 244 U.S. 106, 108, 37 S.Ct. 577, 61 L.Ed. 1022.

The Tax Court also expressed doubt as to the competency of the petitioners' accountant and as to the accuracy of the books which he kept for the corporation and Gordon. We are unable to find in the evidence any suggestion of a basis upon which to predicate such a doubt, however. And, indeed, no such suggestion was made by the Government in argument to the Tax Court. The court suggests in its opinion that the accountant was not offered as a witness to explain the computation of the adjusting entry.

shall be a sum equivalent to One Hundred Seven per cent (107%) of the Corporation's cost thereof, computed as follows, viz.:—costs to be computed under this agreement in accordance with generally accepted principles of accounting, but no item shall be included in costs for general and administrative expenses, selling expenses, depreciation, taxes based upon income or corporate franchise, capital stock or other analogous taxes, excepting, however, that real estate taxes and unemployment and social security taxes shall be included in costs. The Corporation shall submit statements of accounts regularly to Gordon for sales hereunder, estimating as nearly as may be the amounts payable in respect to current sales, and Gordon shall make payment on or before the fifteenth day of each month for all purchases by him during the preceding month. Within three months after the end of each calendar year the exact amount payable by Gordon in respect of purchases during the preceding year shall be computed as nearly as may be and any deficiency in the amount payable by Gordon as thus computed shall be paid by him to the Corporation, or if any overpayment shall thus have been ascertained, the amount of such over-payment shall be refunded or credited."

2. This estimated figure was based on Gordon's sale price.

However, as we have indicated, the parties did have the books and an accountant present in court available for that purpose when the trial judge himself suggested that the parties should stipulate these facts, as they thereupon did.

Further, the Tax Court points to a suggested conflict between Gordon's testimony that he was the corporation's only customer and the fact that the corporate tax return shows total net sales of $31,581.88 as against total sales of the corporation to Gordon of only $29,470.23. From this the court infers that the corporation must have made sales to others than Gordon. Gordon's testimony, however, related only to the sale of manufactured product and the difference may well have involved the sale of surplus raw material which would be entirely consistent with the testimony.

The Tax Court refers to an alleged discrepancy in the corporation's income tax return for 1952. The court states in its opinion:

"*  *  * The balance sheet at the beginning of 1952 shows as a liability 'Accrued Rent' in the amount of $38,754.80. The balance sheet at the end of the year shows 'Accrued Rent' in the amount of $14,400. Normally the foregoing would indicate that during 1952 the corporation had paid rent in at least the amount of the difference between those two amounts, or $24,354.80."

It is perfectly clear upon examining the opening balance sheet set out in the corporation's 1952 return which was placed in evidence by the Government, that it does not show a liability "Accrued Rent" in the amount of $38,754.80. On the contrary, the item "Accrued Rent" is actually in blank and the item of $38,754.80 represents a total of other liabilities which are specified in the balance sheet as notes payable.

It will thus be seen that the reasons given by the Tax Court for rejecting the uncontroverted evidence of the book entries are wholly without substance.

Finally the Tax Court comments on the fact that the record is silent as to the basis upon which the petitioners' income tax return for 1952 was prepared. We think it is clear, however, from the summaries of Gordon's books which are in evidence, as well as from the nature of his business, that the books were kept on an accrual basis. There is no suggestion that the return did not reflect the figures shown by the books. It follows that it was, as it should have been, prepared upon the accrual basis.

It is well settled that a taxpayer who keeps his accounts on the accrual basis should deduct from his gross income expenses which actually accrue in the taxable year, whether paid or not. Aluminum Castings Co. v. Routzahn, 1930, 282 U.S. 92, 99, 51 S.Ct. 11, 75 L. Ed. 234; Dixie Pine Products Co. v. Commissioner, 1944, 320 U.S. 516, 519, 64 S.Ct. 364, 88 L.Ed. 270. It follows that the $21,720.93 charge made in 1952 by the corporation against sales to Gordon, which was shown on the corporation's books as an account receivable from Gordon and which was reflected on Gordon's books as an account payable to the corporation, was a deductible expense item as additional cost of product sold, even though it was not paid in whole or in part in 1952.

The Government suggests that the corporation was merely Gordon's alter ego and that there was no bona fides in the transactions between them. The record, however, does not support this contention. It is true, of course, that Gordon controlled the corporation. But it is also true that a taxpayer may have transactions with his wholly-owned corporation which give rise to recognizable gain or deductible loss. Estate of Julius I. Byrne v. Commissioner, 1951, 16 T.C. 1234, 1244. See annotation 24 A.L.R.2d 470. It is clear that the case before us is such a case. For, as we have seen, the parties entered into a definite agreement regulating their future transactions before any business was conducted and the business which they subsequently transacted between themselves was

carried out strictly in accordance with that agreement. There is no evidence in this case from which it could be found that Gordon was guilty of bad faith or of any manipulation with respect to the allocation between himself and the corporation of the overall loss resulting from their combined business transactions in 1952.

We conclude that the petitioners are entitled to the deduction of $22,097.72 which they claim for the year 1952 and that the Tax Court erred in holding to the contrary.

The decision of the Tax Court will be reversed and the cause will be remanded with directions to enter a decision for the petitioners.