Roy E. Kramer and Frances D. Kramer v. Commissioner.
Kramer v. Commissioner
Docket Nos. 88076, 3174-63.
United States Tax Court
T.C. Memo 1966-234; 1966 Tax Ct. Memo LEXIS 51; 25 T.C.M. (CCH) 1209; T.C.M. (RIA) 66234; October 21, 1966
John Marshall Dahlberg, for the petitioners. Nelson E. Shafer, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: Respondent determined deficiencies in petitioners' income tax, as well as additions to tax under sections 293(b) of the Internal Revenue Code of 1939 and 6653(b) of the Internal Revenue Code of 1954, [1] as follows: Addition to Tax
Sec. 293(b)
Sec. 6653(b)
Docket No.
Year
Deficiency
I.R.C. 1939
I.R.C. 1954
3174-63
1953
$3,599.28
$1,799.64
1954
339.24
$ 169.62
1955
524.04
262.02
88076
1956
3,004.08
1,502.04
*52 The Court, sua sponte, has consolidated these cases for hearing and opinion. The issues presented for our decision are the correctness of the respondent's action in determining (1) that petitioners understated their income in every year from 1953 through 1956, and (2) that petitioners are liable for additions to tax for fraud for 1953 under section 293(b) of the 1939 Code and for 1954 through 1956 under section 6653(b) of the 1954 Code. Findings of Fact Some of the facts have been stipulated and are found accordingly. Roy E. Kramer and Frances D. Kramer, husband and wife, reside in Aurora, Illinois. During the taxable years in question they filed joint income tax returns on a calendar year basis with the district director of internal revenue, Chicago, *53 Illinois. Since Frances D. Kramer is joined here only by virtue of such joint returns, the term "petitioner" will hereinafter be used with reference to Roy E. Kramer. Respondent determined petitioner's income for the years 1953 through 1956 by use of the net worth method of income reconstruction. Respondent's net worth computations, whose component figures were fully stipulated by the parties, are set forth below in Schedules I and II: Schedule I
Net Worth Computation - Unreported Adjusted Gross Income
Balances as of December 31
Assets
1952
1953
1954
1955
1956
Cash
United States Postal Savings (exclud-
ing interest)
$ 3,800.00
$ 3,300.00
$ 3,370.00
$ 3,870.00
$ 5,000.00
Aurora National Bank
369.67
373.36
Old Second Natl. Bank
267.96
50.74
416.32
506.56
783.36
Aurora Savings & Loan
2,000.00
2,000.00
2,000.00
2,000.00
3,000.00
Receivable - Lester J. Fisher
7,900.00
7,156.12
6,365.99
5,527.88
4,662.69
Investments
8,003.58
8,936.08
11,033.58
16,178.34
29,575.00
Automobile
1,500.00
1,500.00
2,000.00
2,000.00
2,500.00
Furniture - personal
1,000.00
1,000.00
1,000.00
1,200.00
1,200.00
Real Estate - 209 N. Ohio St., Aurora
21,000.00
21,000.00
21,000.00
21,000.00
Total Assets
$24,841.21
$45,316.30
$47,185.89
$52,282.78
$67,721.05
Liabilities
Mortgage Payable - Aurora Savings &
Loan Assn.
5,934.17
2,360.67
Reserve for Depreciation [1]
400.00
792.00
1,176.00
Total liabilities
$ 5,934.17
$ 2,760.67
$ 792.00
$ 1,176.00
Net Worth (Total assets minus total lia-
bilities)
$24,841.21
$39,382.13
$44,425.22
$51,490.78
$66,545.05
Net Worth at Beginning of Period
24,841.21
39,382.13
44,425.22
51,490.78
Increase in Net Worth
$14,540.92
$ 5,043.09
$ 7,065.56
$15,054.27
Adjustments
Add: Cost of Living
4,573.77
5,256.83
4,778.06
4,294.89
Subtract - Nontaxable portion of capital gain - per
return
(359.02)
Adjusted Gross Income - corrected
$19,114.69
$10,299.92
$11,843.62
$18,990.14
Adjusted Gross Income - per return
7,525.44
8,757.95
9,704.09
9,368.51
Unreported adjusted gross income
$11,589.25
$ 1,541.97
$ 2,139.53
$ 9,621.63
*54 Schedule II
Net Worth Computation - Understatement of Income Subject to Tax and Taxable Income
1953
1954
1955
1956
Adjusted Gross Income per returns
$ 7,525.44
$ 8,757.95
$ 9,704.09
$ 9,368.51
Add: Unreported adjusted gross income (Schedule I)
11,589.25
1,541.97
2,139.53
9,621.63
Itemized deductions - disallowed per statutory notice
163.18
Subtotal (#1)
$19,277.87
$10,299.92
$11,843.62
$18,990.14
Less: Standard deduction - additional allowances per statu-
tory notices
29.59
1,000.00
Exemptions - per returns
1,800.00
1,800.00
2,400.00
2,400.00
Itemized deductions or standard deductions - per re-
turns
1,163.18
1,538.11
970.41
Subtotal (#2)
$ 2,963.18
$ 3,338.11
$ 3,400.00
$ 3,400.00
Income subject to tax (1953), and taxable income
(1954-1956) - subtotal (#1) less subtotal (#2) - as co-
rected
$16,314.69
$ 6,961.81
$ 8,443.62
$15,590.14
Income subject to tax (1953), and taxable income
(1954-1956) - per returns
4,562.25
5,419.84
6,333.68
6,031.66
Understatement of income subject to tax (1953) and
taxable income (1954-1956)
$11,752.44
$ 1,541.97
$ 2,109.94
$ 9,558.48
*55 Application of the foregoing net worth schedules result in the following comparative results: Schedule III
Adjusted Gross Income (AGI)
Unreported AGI as
Unreported
percent of cor-
Year
Per return
As corrected
AGI
rected AGI
1953
$ 7,525.44
$19,114.69
$11,589.25
60.63%
1954
8,757.95
10,299.92
1,541.97
14.97%
1955
9,704.09
11,843.62
2,139.53
18.06%
1956
9,368.51
18,990.14
9,621.63
50.67%
Cumulative total
$35,355.99
$60,248.37
$24,892.38
41.32%
Schedule IV
Income Subject to Tax or Taxable Income (TI)
Unreported TI as
Unreported
percent of cor-
Year
Per return
As corrected
TI
rected TI
1953
$ 4,562.25
$16,314.69
$11,752.44
72.03%
1954
5,419.84
6,961.81
1,154.97
22.15%
1955
6,333.68
8,443.62
2,109.94
24.99%
1956
6,031.66
15,590.14
9,558.48
61.31%
Cumulative total
$22,347.43
$47,310.26
$24,962.83
52.76%
Prior to 1945, petitioner had earned a livelihood in various employment, including his own beverage agency, his father's transfer business, the Aurora Police Department, employment as an iron worker, and work on the Alcan Highway *56 in Alaska. Beginning in 1941, petitioner entered into the following real estate transactions, principally in the Chicago area: Purchased
Sold
Description
Date
Price
Date
Price
1. 22 N. Spencer St., Aurora, Ill.
10/ 4/41
$ 7,500
10/18/45
$ 7,700
2. Lot 5, Naperville, Ill.
1946
11,500
6/16/47
14,500
3. 318-20 S. Broadway, Aurora, Ill.
7/ 1/47
12,500
9/27/49
14,500
4. 629 Aurora Ave., Aurora, Ill.
3/ 1/50
5,500
3/20/51
4,000
12/ 3/52
4,600 [1]
5. 820 Claim St., Aurora, Ill.
6/23/50
6,000
11/19/52
10,000
6. Lot 65, Orlando, Fla.
4/27/51
2,500
12/29/52
2,500
Total
$45,500
$57,800
The sale of 820 Claim Street in November 1952 was made under an installment contract to Lester J. and Nettie Jewel Fisher, husband and wife. Although the sale price was $10,000, the following principal amounts *57 were due and owing by the Fishers on the dates indicated below: December 31
Amount unpaid
1952
$7,900.00
1953
7,156.12
1954
6,365.99
1955
5,527.88
1956
4,662.69
During the years in question, 1953 through 1956, petitioner was the sole income-producing member of his family. During those years he was engaged in various income-producing activities, including employment as the business agent for the Iron Workers International Union, Local 393, Aurora, Illinois. As business agent, petitioner had financial dealings with the local union and its members, including collection of the following funds: 1. Monthly dues 2. Daily working assessments 3. Permit fees 4. Union Stamp sales 5. Initiation fees 6. Picnic fund
7. Sickness fund When collecting for these funds, petitioner did not always furnish a contemporaneous receipt to union members. Sources of nontaxable income received by petitioner and his wife, during the years in question, such as gifts, loans, and inheritances, were minimal. Although petitioner maintained a safedeposit box at Aurora National Bank, Aurora, Illinois, from September 1943 through July 1960, neither petitioner nor his wife *58 had any substantial accumulation of cash in such box on January 1, 1953. Petitioner's taxable income for each of the taxable years in question is as indicated in the net worth statement designated "Schedule II" in these Findings of Fact. The entire deficiency in petitioner's income tax for each of the years 1953 through 1956 was due to fraud with intent to evade tax. Opinion Issue 1 Deficiency Determination Section 446(d) of the 1954 Code [2] provides that if the method of accounting used by a taxpayer does not clearly reflect his income, the Secretary of the Treasury shall compute his taxable income under a method which will clearly reflect it. Relying on this provision, as well as its counterpart under the 1939 Code, [3] respondent determined petitioner's income for the years 1953 through 1956 under the "net worth" method of income reconstruction. Application of that method resulted in a deficiency determination in petitioner's income tax for the years 1953 through 1956 totaling $7,466.64. In addition, respondent determined additions to tax for fraud under section 293(b) of the 1939 Code for the year 1953 and section 6653(b) of the 1954 Code for the years 1954 through 1956, *59 increasing the total deficiency to $11,199.96. Since the net worth computations set out in the Findings of Fact were developed entirely from stipulated items and amounts and since those computations substantially support respondent's deficiency determination, [4] we must affirm the deficiency unless petitioner has established the existence of a cash hoard at the beginning of the period in question, January 1, 1953. In a tax case involving civil fraud, although the Government bears the burden of proving fraud, the burden of disproving the deficiencies rests on petitioner. Joseph B. Moriarty, 18 T.C. 327, 329 (1952), affd. per curiam 208 F. 2d 43 (C.A.D.C. 1953). Accordingly, respondent's deficiency determination based on the net worth method is presumptively correct in the absence of serious challenge by petitioner. Clark v. Commissioner, 253 F. 2d 745, 747 (C.A. 3, 1958), affirming in part and reversing in part a Memorandum Opinion of this Court. *60 As a formula, the net worth method of reconstructing income has been expressed as follows: "[The] increase in net worth plus non-deductible disbursements minus non-taxable receipts equals taxable net income." Clark v. Commissioner, supra. The validity of this method is based on the assumption that increases in a taxpayer's net worth are derived from unreported taxable income received in the year or years for which a deficiency is asserted. It follows that such an assumption may be effectively rebutted if the taxpayer can show the existence of a cash hoard at the beginning of the taxable period under consideration. Thus, a taxpayer might establish the existence of substantial cash on hand by showing that prior to the period under consideration his income from all sources exceeded his total cash outflow, that his stock or real estate was sold at a profit, or that he received nontaxable income such as gifts, inheritances, or loans. Holland v. United States, 348 U.S. 121 (1954), rehearing denied 348 U.S. 932 (1955). The importance of accurately determining the taxpayer's net worth as of the beginning of the period was emphasized by the Supreme *61 Court in the Holland case where it was said, at page 132, that - an essential condition in cases of this type is the establishment, with reasonable certainty, of an opening net worth, to serve as a starting point from which to calculate future increases in the taxpayer's assets. The importance of accuracy in this figure is immediately apparent, as the correctness of the result depends entirely upon the inclusion in this sum of all assets on hand at the outset. * * * Although petitioner relies on the existence of a substantial cash hoard at the beginning of the taxable period in question, January 1, 1953, we deem it significant that neither in his pleadings, at trial, nor in his brief has he suggested the actual amount of such cash hoard as of that date. While there is in evidence an exhibit (hereinafter designated "Exhibit 8") prepared by petitioner's accountant purporting to show petitioner's net worth from 1945 through 1957, the amount identified therin on December 31, 1952, as "Cash on Hand - Safe Deposit" was never verified by the accountant. It is merely reflective of the amount petitioner told his accountant was contained therein on that date. Based as it is on hearsay, we *62 can give no probative value to such an entry in determining the existence vel non of petitioner's alleged cash hoard at the beginning of the taxable period. In a further effort to support his alleged cash hoard theory, petitioner testified that he was able to accumulate substantial cash savings through his earnings and real estate transactions prior to 1953. While the record discloses that petitioner held numerous jobs prior to that year, there is no showing by competent evidence that either his prior employment or his real estate transactions actually resulted in the alleged cash hoard. Although petitioner's Exhibit 8 included cost of living schedules, net worth statements, and various worksheets, all prepared by his accountant and intended to reflect petitioner's financial condition from 1945 through 1957, we must reject the results expressed in those statements inasmuch as they are based on unreliable and often inaccurate accounting entries. The financial statements comprising that exhibit were prepared by petitioner's accountant who was not employed by petitioner until after the period covered by the statements. His accountant testified that he had not verified any of the entries *63 regarding petitioner's cost of living during the years covered by the net worth statement. We think it significant, therefore, that a comparison of petitioner's cost of living expenses for the years 1953 through 1956 as provided by that exhibit and his cost of living expenses for the same period as stipulated (Stipulation paragraph 11) reveals consistent and significant understatements of his expenses in the schedules comprising the exhibit, with the result that petitioner's net worth during those years is correspondingly overstated. Since the cost-of-living figures employed in Exhibit 8 for the years 1953 through 1956 are unreliable, we have no reason to believe that the cost figures for prior years, as disclosed by that exhibit, are to be accorded any greater reliability. An examination of petitioner's real estate sales from 1941 through December 1952 likewise fails to support the existence of any substantial cash accumulation as of January 1, 1953, from that source. As disclosed by the table of petitioner's real estate transactions set out in our Findings, the total sales price for all six parcels of real estate owned and sold by petitioner from 1941 through 1952 only exceeded *64 the cost of such property by $12,300, an amount considerably less than petitioner's alleged cash hoard as of January 1, 1953. [5] However, only a small portion, if any, of that amount was actually available in cash to comprise the alleged cash hoard in petitioner's safedeposit box on January 1, 1953. With regard to the sale of 820 Claim Street in November 1952, the record discloses that although the property was sold for $10,000, the unpaid balance on that property as of December 31, 1952, was $7,900. Since respondent included that amount in petitioner's net worth computation as an asset for the year ended December 31, 1952, "Receivable - Lester J. Fisher," that same amount must be subtracted from the $12,300, leaving only $4,400 of possible cash from real estate profits as of December 31, 1952. Even this modified figure is subject to question for the record discloses that while petitioner's property at 629 Aurora Avenue was sold in 1950, he did not receive the final $2,000 on the sale price until December 1952. Since that $2,000 was paid to petitioner from Aurora Savings and Loan Association on behalf of the purchasers of the Aurora Avenue property and since petitioner opened a savings *65 account in 1952 at that same savings and loan association in the exact amount of $2,000, we think it more likely than coincidental that the money received from the association on account of the Aurora property was used by petitioner to open that savings account. If that was the case, petitioner's potential cash hoard from real estate sales is reduced an additional $2,000 to $2,400, inasmuch as respondent's net worth computation properly reflected the $2,000 savings account at Aurora Savings and Loan Association in petitioner's net worth computation as of December 31, 1952. From the foregoing facts we are satisfied that petitioner has failed to prove that his earnings or real estate sales prior to December 31, 1952, enabled him to accumulate a substantial cash hoard as of that date. Petitioner's cash hoard theory is further weakened by his own statement made to the revenue agent who conducted an audit of his returns for the years in question. While the testimony on this point is not without some contradiction, we are satisfied *66 from all the testimony relating thereto that petitioner and his wife, when questioned by the revenue agent at the time their tax returns for the years in question were audited, denied the existence of any cash hoard from 1952 to 1957. From the foregoing, we conclude that petitioner failed to prove the existence of his alleged cash hoard as of the beginning of the period in question, January 1, 1953. The evidence adduced at trial further established that neither petitioner nor his wife had received gifts, loans, or inheritances of any significant size during the taxable years in question, thus dispelling the possibility that the increase in petitioner's net worth from 1953 through 1956 could have resulted from the receipt of nontaxable income. The facts in this case having dispelled the possibility that petitioner's increase in net worth from 1953 through 1956 was attributable to a cash hoard in existence on January 1, 1953, or to nontaxable sources, it follows, we think, that the increases in petitioner's net worth during those years were attributable to unreported taxable income as found by respondent, even without proof of a likely source. As the Supreme Court stated in United States v. Massei, 355 U.S. 595 (1958), *67 "should all possible sources of nontaxable income be negatived, there would be no necessity for proof of likely source." While the evidence appears to negative the existence of all possible sources of nontaxable income, we need not indulge in such an assumption to sustain respondent's deficiency determination where, as here, the facts disclose the existence of a likely source of taxable income to petitioner. As the Supreme Court stated in Holland v. United States, supra, at pages 137-38: Increases in net worth, standing alone, cannot be assumed to be attributable to currently taxable income. But proof of a likely source, from which the jury could reasonably find that the net worth increases sprang, is sufficient. * * * During the years 1953 through 1956 petitioner was the business agent of Local 393 of the Iron Workers International Union, Aurora, Illinois. In that capacity, petitioner functioned as the union collection agent for the following funds: monthly dues, daily work assessments, [6] permit fees, union stamp sales, [7] initiation fees, picnic fund, [8] and sickness fund. Although petitioner testified that he gave receipts to members for amounts he collected *68 from them, his testimony was contradicted by John Minich, a member and recording secretary of Local 393 from 1953 to 1955. Minich testified that during those years he personally observed petitioner collect various dues and assessments from members of Local 393 without giving them contemporaneous receipts. While the record indicates neither the number of members that were in Local 393 during the years in question nor the total amount of money petitioner collected as business manager during that period, we believe that considering the numerous union funds petitioner handled, together with evidence that petitioner failed to give receipts for all moneys so collected, the evidence discloses a likely source of taxable income available to petitioner which could account for the increases in petitioner's net worth during the years 1953 through 1956. Holland v. United States, supra.
*69 Based upon the foregoing facts and circumstances, we conclude that petitioner had no cash hoard as of January 1, 1953, and therefore his increase in net worth from 1953 through 1956 resulted from unreported taxable income as disclosed by the net worth method. Accordingly, we sustain respondent's determination of deficiency for all years in question. Issue 2 Fraud Respondent determined additions to petitioner's tax for 1953 under the fraud provisions of the 1939 Code, section 293(b), and for 1954 through 1956 under the fraud provisions of the 1954 Code, section 6653(b). The fraud meant by the 1939 and 1954 Code provisions is "actual, intentional wrong-doing, and the intent required is the specific purpose to evade a tax believed to be owing." Mitchell v. Commissioner, 118 F. 2d 308, 310 (C.A. 5, 1941); Tomlinson v. Lefkowitz, 334 F. 2d 262, 265 (C.A. 5, 1964), certiorari denied 379 U.S. 962 (1965). The burden of proof with respect to fraud is upon respondent [9] and he must establish by clear and convincing evidence that at least some part of the dificiency for each year in issue is due to fraud with intent to evade tax. Arlette Coat Co., 14 T.C. 751, 756 (1950). *70 It is now well established that in a tax fraud case "consistent failure to report substantial amounts of income over a number of years, standing alone, is effective evidence of fraudulent intent." Schwarzkopf v. Commissioner, 246 F. 2d 731, 734 (C.A. 3, 1957), affirming a Memorandum Opinion of this Court. See also Holland v. United States, supra.
Having rejected the existence of petitioner's alleged cash hoard as of January 1, 1953, we accept the results provided by respondent's net worth schedules. Those schedules reveal that in each of the 4 tax years in question petitioner failed to report substantial amounts of income. As set forth in our Findings of Fact, Schedule III discloses that from 1953 through 1956 petitioner's total unreported adjusted gross income averaged 41.32 percent of his corrected adjusted gross income. During the same period, petitioner's total unreported taxable income, as set forth in Schedule IV, supra, averaged 52.76 percent of his corrected taxable income. We further note that for the years involved, petitioner's unreported taxable income varied from a low *71 of 22.15 percent of corrected taxable income in 1954 to more than 72 percent in 1953. As we have recognized in past fraud cases, proof of fraud must depend in some respects upon circumstantial evidence since it is not often that a taxpayer's own testimony will be contradicted. Here, however, petitioner's testimony has been effectively contradicted in at least two significant respects. First, contrary to petitioner's statements at trial that he had large sums of money in his safedeposit box at the beginning of the tax period in question, respondent's witness, the revenue agent who audited petitioner's returns, testified that during the course of his audit petitioner specifically denied the existence of any cash hoard from 1952 to 1957. Secondly, petitioner testified that in his capacity as collection agent for his local union, he always gave receipts to union members for dues and other assessments collected. This testimony was contradicted by statements of John Minich, who testified that as a member and officer of Local 393 during the years 1953 to 1955, he personally observed petitioner fail to give receipts to union members for amounts collected from them. In addition, as we observed, *72 supra, the net worth statements introduced by petitioner and prepared by his accountant are based upon many erroneous entries and are therefore unreliable and necessarily misleading. Petitioner's net worth, as arrived at by those statements, are more favorable to petitioner's case than would be true if correct figures, as stipulated by the parties, had been used. Usually, where uncontradicted testimony is relevant and credible, we may not arbitrarily disregard it, Banks v. Commissioner, 322 F. 2d 530, 537 (C.A. 8, 1963), Gordon v. Commissioner, 268 F. 2d 105, 107 (C.A. 3, 1959), but where, as here, both petitioner's testimony and exhibits bearing on his net worth during the tax years involved, have been directly contradicted by credible testimony and competent evidence, we are justified in disregarding that evidence. In light of all the circumstances and upon the record as a whole, we think respondent has established by clear and convincing evidence that petitioner intentionally understated his income for the years 1953 through 1956 in a substantial amount. Accordingly, the deficiencies determined by respondent for those years were due to fraud with intent *73 to evade tax, thereby making petitioners liable for additions to tax under the relevant fraud provisions of the 1939 and 1954 Codes. Decisions will be entered under Rule 50. Footnotes
1. The fraud provision of the 1939 Code, section 293(b) is substantially identical to section 6653(b) of the 1954 Code which latter provision reads, in pertinent part, as follows: SEC. 6653. FAILURE TO PAY TAX. * * *
(b) Fraud. - If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * *↩
1. Inasmuch as petitioner claimed (and was erroneously allowed by respondent) depreciation on an entire two-flat apartment building, one-half of which was used as his personal residence during 1954 through 1956, the "Reserve for Depreciation" deduction in each year applicable is twice as large as it should be, causing a corresponding understatement in petitioner's increase in net worth for those years. However, since respondent has failed to amend his pleadings for the purpose of having the Court impose an additional deficiency on petitioner because of the excessive depreciation inadvertently allowed him, no purpose would be served by recomputing the net worth and related schedules to reflect that oversight.↩
1. A sale contract in the amount of $4,600 was entered during April 1950. Purchasers made a $300 down payment and thereafter made monthly payments of $75 through November 1952. In December 1952, final payments in the amounts of $2,000 and $734.77 were made on behalf of the purchasers by Aurora Savings and Loan Assn.↩
2. All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated. ↩
3. Section 41 of the Internal Revenue Code of 1939↩.
4. Some of the component figures used by respondent in preparing the net worth computation relied upon to make the original deficiency determinations differ from the figures ultimately stipulated to and used to prepare the net worth computations set out in our Findings. Thus, deficiencies and additions to tax arrived at by application of the latter computations will necessarily differ in amount from those stated in the original deficiency notices and should be changed by a Rule 50 computation.↩
5. Petitioner's net worth schedule as of December 31, 1952, as disclosed in Exhibit 8, reflected cash of $24,783.43 in petitioner's safe-deposit box.↩
6. Petitioner testified that an assessment was a specific amount of money, determined by vote of the local union, which each member was required to contribute to the local union periodcally, i.e., "like $2 a week, $4 a week." ↩
7. Although the precise nature of these stamps was not disclosed, petitioner testified that he received stamps from the International Union in St. Louis which he in turn sold to the union members at a profit. ↩
8. While the picnic fund was used at least in part to defray the cost of serving food after union meetings, the fund consisted not only of member contributions but of proceeds from tickets sold by petitioner to local building contractors who employed members of Local 393.↩
9. Section 1112 of the 1939 Code; section 7454 (a) of the 1954 Code.↩