Lawrence R. Godfrey v. Commissioner.
Godfrey v. Commissioner
Docket No. 3439-65.
United States Tax Court
T.C. Memo 1968-199; 1968 Tax Ct. Memo LEXIS 99; 27 T.C.M. (CCH) 966; T.C.M. (RIA) 68199; September 10, 1968. Filed Morris J. Oppenheim, for the petitioner. Leo A. Burgoyne, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: The respondent determined *100 deficiencies in the petitioner's income tax and additions to tax for the years and in the amounts as follows: Additions to Tax
Sec. 294
(d)(1)(A)
Sec.6653(b)
I.R.C.
I.R.C.
Year
Deficiency
1939
1954
1954
$5,814.92
$518.04
$ 2,932.46
1955
7,649.34
3,824.67
1956
8,162.99
4,169.00
1957
2,616.18
1,308.09
1958
1,120.81
560.41
1959
179.01
89.51
The principal question is whether any part of any deficiency in tax for the years 1954 through 1958 was due to fraud with intent to evade tax. Assessment and collection of deficiencies in tax and additions to tax for the years 1954 and 1956 are barred by the statute of limitations (sec. 6501(a), 1954 Code) unless fraud is proved; and for the years 1955 and 1957 unless fraud is proved or unless petitioner omitted income in excess of 25 percent of the gross income reported on his returns for those years so the 6-year statute of limitations provided in section 6501(e) of the 1954 Code is applicable. Assessment and collection of deficiencies in tax and additions thereto for the years 1958 and 1959 are not barred by the statute of limitations. Petitioner has conceded the deficiency *101 in tax for the year 1959 and respondent has conceded the addition to tax for fraud for that year. Findings of Fact Petitioner was born on August 16, 1897, and resided in Asbury Park, N.J., at the time the petition herein was filed and during the years here involved. Petitioner filed individual income tax returns for the calendar years 1954 to 1959, inclusive, with the then district director of internal revenue, Camden, N.J. On January 19, 1962, before the expiration of the time prescribed in section 6501 967 (e)(1), I.R.C. of 1954, [1] for assessment of additional income taxes against petitioner for the taxable year 1955, petitioner and respondent agreed in writing pursuant to section 6501(c)(4) to extend to June 30, 1963, the time within which respondent might assess additional income taxes against petitioner for the taxable year 1955. Thereafter, on January 4, 1963, and on January 24, 1964, similar agreements were executed extending to June 30, 1964, and June 30, 1965, respectively, the period for assessing additional income taxes against petitioner for the taxable year 1955. *102 On March 13, 1964, before the expiration of the time prescribed in section 6501(e)(1) for assessment of addtional income taxes against petitioner for the taxable year 1957, petitioner and respondent agreed in writing pursuant to section 6501(c)(4) to extend to June 30, 1965, the time within which respondent might assess additional income taxes against petitioner for the taxable year 1957. The notice of deficiency for all the years involved herein was dated March 26, 1965. During the years 1954, 1955, 1956, and until the latter part of 1957 petitioner was employed by the city of Asbury Park, N.J., as repairman for its parking meters. In November or December of 1957 petitioner bought a half interest in a bar business, which was incorporated as Pete & Larry's, Inc., which he disposed of in 1958. During all the years here involved petitioner lived in a house which he owned in Asbury Park. Petitioner had been married and divorced several times prior to 1954 but had no children. He was married for a period of 6 or 7 weeks during the early part of 1954 but this marriage terminated after this short period. Petitioner was not married again and lived alone thereafter except for a housekeeper *103 and her daughter who may have lived in petitioner's house some of the time here involved. Petitioner, on his income tax returns for the taxable years 1954, 1955, and 1956, reported his salary from the city of Asbury Park, N.J., as his only income subject to tax in those years, in the following amounts: Taxable
Salary
Year
1954
$3,520.00
1955
3,699.81
1956
3,992.00
Petitioner, on his income tax return for the taxable year 1957, reported salaries of $3,860.92 and $172 from the city of Asbury Park, N.J., and from "Pete & Larry's Corp.," respectively, as his only income in such year. Petitioner, on his income tax return for the taxable year 1958, reported a salary of $846.60 from Pete & Larry's, Inc., as his only income subject to tax, a long-term capital loss of $1,000, and no taxable income. Petitioner, on his income tax return for the taxable year 1959, reported a profit from business (independent salesman) of $410 as his only income subject to tax in that year. Petitioner's wages from the city of Asbury Park, N.J., for the calendar years 1935 to 1953, inclusive, were as follows: Year
Salary
1935
$ 199.88
1936
227.25
1937
213.79
1938
1939
150.07
1940
410.67
1941
899.18
1942
991.6 0
1943
1,232.00
1944
1,184.00
1945
1,632.00
1946
1,622.08
1947
1,812.00
1948
2,086.04
1949
2,284.44
1950
2,314.10
1951
2,780.40
1952
2,930.00
1953
3,261.81
*104 It is not shown in the record in what capacity petitioner was employed by the city of Asbury Park prior to 1954 except that in November 1953 he was assigned by the city to the parking meters function as a repairman. In May 1957, Kendall Lee became City Manager of Asbury Park, N.J., and continued in that capacity until April of 1965. Shortly after Lee became City Manager he initiated an investigation to determine whether city parking meter revenues were being pilfered. Lee was prompted to request such an investigation primarily because of rumors, both before he became City Manager and immediately thereafter, that pilfering of parking meters was occurring. In July or August of 1957 Lee assigned a retired State Police Captain named Wallace to conduct the physical part of the investigation. He was assisted by J. Victor Carton, a member of the New Jersey bar with experience as prosecutor of Monmouth County, N.J. Before Wallace undertook the investigation it was Lee's understanding that it took 968 two keys to open a parking meter and to empty out the parking meter contents, one key to open the back of the meter and the other key to release the coin box that was inside the meter. *105 The investigation showed that a number of the meters had been tampered with to the extent that it was only necessary to open the back of the meter box and to slide out the coin receptacle, thereby eliminating the need for the second key. Petitioner, as repairman for the parking meters, had possession of the keys to open the back of the meter box, which he was required to turn in each day. He was not permitted to have keys to release the coin box. Petitioner, while employed as a parking-meter repairman, was the only such repairman in Asbury Park, N.J. Petitioner had no duties with respect to collection of the parking meter receipts; this was the responsibility of the police department. From July 1957 through December 1957 parking meter receipts totaled $135,411. For the same period for the previous year, July through December of 1956, parking meter receipts totaled only $90,253. Parking meter receipts for the 24-month period following the commencement of the parking meter investigation, July 1957 through June 1959, totaled $448,844 as contrasted to parking meter receipts for the 24-month period preceding the commencement of the parking meter investigation, July 1955 through June 1957, *106 of $283,957. A yearly breakdown of parking meter receipts received by the city of Asbury Park, N.J., rounded off to the nearest dollar, follows: Year
Amount
1954
$ 128,742
1955
134,238
1956
135,657
1957
194,218
1958
222,601
1959
222,529
There were approximately 2,500 to 2,600 parking meters, all of the same type, in operation in July 1957, when the investigation commenced, which was substantially similar to the number of meters in operation prior to July 1957. The meter rates in effect before the 1957 investigation did not change after the investigation, i.e., 2 1/2 hours for 25(, 1 hour for 10(, and 5( for a half hour. Automobile traffic in Asbury Park increased to some extent during the years here involved. In December of 1957 petitioner was questioned at length by City Manager Lee and Special Counsel Cartton about the meter pilfering. These interviews were stenographically recorded and a transcript thereof was offered in evidence by respondent and received in evidence without objection. The investigators found no evidence which involved petitioner in meter pilfering and no charges were brought against him although evidence was found against two police *107 officers who were charged with taking money from parking meters. James J. King, Special Agent, Internal Revenue Service, was assigned to investigate petitioner's income tax returns for the years involved sometime in March of 1960. King canvassed the area banks, stock brokerage houses, and the public records from Monmouth and Ocean Counties, N.J., to determine whether petitioner was involved in any securities, real estate, or mortgage transactions during the 7 to 8-year period prior to the time the case was assigned to him. As a result of his canvass, King obtained information concerning petitioner's bank deposits. King could not account for the excess of bank deposits over and above the income reflected in petitioner's income tax returns. King then had the petitioner come in to his office for an interview, in November 1960, to ascertain whether petitioner could explain the source of these deposits. This interview was stenographically recorded and a transcript thereof, signed by both King and petitioner, was offered in evidence by respondent and received in evidence without objection. During the course of this interview petitioner told King, in effect, that he had made a considerable *108 amount of money in New York City as a "pysical director, massager, and reducing artist," and trading in antiques, jewelry, and art; that he had about $25,000 in cash when he moved from New York to Asbury Park in the early 1930 , which he either kept at home or gave to his mother to keep for him; that when his mother died in 1943 and when his father died in about 1950, he received additional cash which he kept at home; that for some time during the 1930's and 1940's he was also employed as a constable; that the wife from whom he was divorced in 1952 knew about the cash he kept at home; that when they were divorced in 1952 the wife took the house and gave petitioner about $5,000 in cash for his share therein; that he continued his activities trading in antiques and jewelry throughout the years here involved; that by 1954 his cash hoard had grown to about $40,000 which his wife of a few weeks did not know about; and that he began 969 depositing this cash in various banks and a savings and loan association in 1954 and subsequent years. Petitioner also denied any direct knowledge of or participation in the pilfering of parking meter revenues. After taking petitioner's statement King *109 did no further work on petitioner's case. Special Agent Kreidler was assigned to petitioner's case in August of 1961, King having been assigned to another matter. Kreidler took over and reviewed the data and information compiled by King and read the transcript of the statement given by petitioner to King in November of 1960. He also read a transcript of the 1957 interview of petitioner by Lee and Carton with respect to the parking meter pilferage. Kreidler interviewed petitioner several times, which interviews were apparently not recorded, and talked to several other people whose names petitioner mentioned. Neither King nor Kreidler visited petitioner's home nor made any independent investigation of petitioner's trading activities or his possible connection with the parking meter pilferage. At the conclusion of his investigation Kreidler determined that petitioner had no cash hoard on hand at the beginning of 1954; that the excess of petitioner's bank deposits during the years 1954-1958 over the income reported on petitioner's returns could not be reasonably explained by anything petitioner told the agents during the course of the investigation; and that petitioner had no nontaxable *110 source of income during those years, but that he did have a source of taxable income, pilferage from the parking meters and the showing or sale of pornographic films, which petitioner had not reported on his returns. Kreidler and the revenue agent working with him thereupon prepared a net worth and personal expenditures statement for petitioner for the years January 1, 1954, through December 31, 1958, and determined petitioner's taxable income for each of those years to be as reflected in the increases in his net worth and his nondeductible personal expenditures. The assets and liabilities included in the net worth statement were only those revealed by the investigation conducted by King and Kreidler. The statement did not include items such as furniture and furnishings, antiques, jewelry, films, or other tangible assets, and did not purport to be a complete reflection of all of petitioner's assets and liabilities. Personal living expenses were estimated to be $4,000 for each of the years 1954-1958. The net worth and personal expenditures statement prepared by Kreidler was as follows: 970 ASSETS
12/31/53
12/31/54
12/31/55
Cash on hand
Cash in banks:
Savings accounts:
Asbury Park Nat. Bk. (#15694 and 75346)
$ 6,029.50
$10,108.70
$10,114.18
Allenhurst Nat. Bk. (#13598)
10,000.00
Allenhurst Nat. Bk. (#10937)
10,033.00
Shadow Lawn S. & L. (#13834)
10,050.00
1st Nat. Bk., Bradley Beach (#15190)
Checking accounts:
Asbury Park Nat. Bk.
1,572.88
2,586.65
10,089.50
1st Nat. Bk., Bradley Beach
Residence:
6 Deal Lake Dr., Asbury Park, N. J.
15,000.00
15,000.00
15,000.00
Investment:
Pete & Larry's, Inc., capital stock
Loans receivable:
Pete & Larry's, Inc.
Automobile:
Cadillac
TOTAL ASSETS
$22,602.38
$37,695.35
$55,286.68
*111 ASSETS
12/31/56
12/31/57
12/31/58
Cash on hand
$ 4,000.00
Cash in banks:
Savings accounts:
Asbury Park Nat. Bk. (#15694 and 75346)
$10,368.60
15,191.23
$20,001.45
Allenhurst Nat. Bk. (#13598)
Allenhurst Nat. Bk. (#10937)
10,158.41
10,000.00
10,302.25
Shadow Lawn S. & L. (#13834)
10,353.75
10,150.00
10,456.78
1st Nat. Bk., Bradley Beach (#15190)
20,125.00
20,000.00
20,604.50
Checking accounts:
Asbury Park Nat. Bk.
6,233.48
1,878.97
1,514.19
1st Nat. Bk., Bradley Beach
5,000.00
Residence:
6 Deal Lake Dr., Asbury Park, N. J.
15,000.00
15,000.00
15,000.00
Investment:
Pete & Larry's, Inc., capital stock
10,000.00
Loans receivable:
Pete & Larry's, Inc.
2,000.00
Automobile:
Cadillac
2,425.00
2,425.00
2,425.00
TOTAL ASSETS
$74,664.24
$90,645.20
$85,304.17 971 LIABILITIES
12/31/53
12/31/54
12/31/55
Mortgage payable:
Keystone S. & L.
Residence
$ 7,667.42
$ 7,340.23
$ 6,794.15
Demand note:
Asbury Park Nat. Bk.
TOTAL LIABILITIES
7,667.42
7,340.23
6,794.15
Net worth - current yr.
14,934.96
30,355.12
48,492.53
Net worth - prior yr.
14,934.96
30,355.12
Net worth - increase or decrease
15,420.16
18,137.41
ADD: Living exp. estimated
4,000.00
4,000.00
Fed. income tax - pd. - w.t.
396.20
519.30
Fed. income tax - refunds
( 253.22)
( 217.70)
Adjusted gross income - corrected
19,563.14
22,439.01
Adjusted gross income - reported
3,520.00
3,699.81
Unreported income - other sources
$16,043.14
$18,739.20
Unreported income
Nondeductible portion capital loss -
included in net worth computation
TOTAL ADJUSTMENT
*112 LIABILITIES
12/31/56
12/31/57
12/31/58
Mortgage payable:
Keystone S. & L.
Residence
$ 6,321.69
$ 5,831.76
$ 5,459.98
Demand note:
Asbury Park Nat. Bk.
7,000.00
TOTAL LIABILITIES
6,321.69
12,831.76
5,459.98
Net worth - current yr.
68,342.55
77,813.44
79,844.19
Net worth - prior yr.
48,492.53
68,342.55
77,813.44
Net worth - increase or decrease
19,850.02
9,470.89
2,030.75
ADD: Living exp. estimated
4,000.00
4,000.00
4,000.00
Fed. income tax - pd. - w.t.
598.20
457.40
78.10
Fed. income tax - refunds
( 192.54)
( 265.92)
( 457.40)
Adjusted gross income - corrected
24,255.68
13,662.37
5,651.45
Adjusted gross income - reported
3,992.00
4,032.92
( 153.40)
Unreported income - other sources
$20,263.68
$ 9,629.45
$ 5,804.85
Unreported income
5,804.85
Nondeductible portion capital loss -
659.70
included in net worth computation
TOTAL ADJUSTMENT
$ 6,464.55 972 Petitioner's taxable income for the years 1954-1958 as determined in the notice of deficiency was computed from the above net worth and expenditures statement. In his answer to the petition filed in this case respondent included as Exhibit *113 A a net worth statement which was the same in all respects as the above statement except that the item of cash on hand at December 31, 1957, in the amount of $4,000, included in the above statement, was eliminated. This resulted in decreasing petitioner's taxable income by $4,000 for 1957 and increasing it by the same amount for 1958. Petitioner has stipulated that all of the assets and liabilities, and the amounts thereof, shown on the net worth statement attached to respondent's answer were assets and liabilities of petitioner on the dates shown. However, petitioner does not agree that the net worth statement includes all of petitioner's assets and liabilities as of any year end, or correctly reflects petitioner's actual net worth at the end of any year, or correctly reflects petitioner's nondeductible cash living expenses for any of those years. Petitioner purchased a 1952 Cadillac on December 22, 1955, at a cost of $1,995. On April 26, 1956, petitioner purchased a 1955 Cadillac at gross price of $4,395, less tradein allowance on the 1952 Cadillac of $1,970 for a net cost of $2,425, which was paid by check. Petitioner kept the 1955 Cadillac from the date of purchase through *114 December 31, 1958. Petitioner owned an automobile prior to December of 1955. Petitioner failed to report on his income tax returns for the years 1954 to 1958, inclusive, the following interest income earned on savings accounts: Year
Amount
1954
$ 79.20
1955
184.33
1956
864.58
1957
1,191.91
1958
1,213.53
On March 20, 1963, the Grand Jury in and for the District of New Jersey returned an indictment charging in Counts 1 and 2 that petitioner did willfully and knowingly attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar years 1956 and 1957 by filing and causing to be filed with the district director of internal revenue for the Internal Revenue District of Camden, N.J., false and fraudulent income tax returns. On February 17, 1964, defendant was convicted upon his plea of nolo contendere of the offense of attempt to evade and defeat income tax by filing a false return for the taxable year 1957 and received a suspended sentence and was placed on probation for a period of 5 years. The indictment covering the year 1956 was dismissed. Opinion When this case was called from the *115 trial calendar counsel for petitioner advised the Court that due to chronic illness, attested to by a statement from petitioner's attending physician, petitioner would be unable to attend the trial; however, petitioner did not seek a continuance and urged that the case proceed to trial. Under the circumstances, counsel for petitioner advised that petitioner would rest his case "on the petition and leave the respondent to its proof of income and fraud." In his pleadings petitioner relies on the statute of limitations and denies the sufficiency and accuracy of respondent's net worth statement to correctly reflect petitioner's income or prove fraud. The case proceeded to trial with respondent offering the oral testimony of several of the officials of the city of Asbury Park who participated in the investigation of the parking meter pilfering, and the two special agents who conducted the investigation of petitioner's returns. The case was then submitted to the Court on the stipulation of facts with exhibits attached and the evidence offered by respondent. The first question we should consider is whether fraud has been proved, because assessment and collection of the tax and additions *116 thereto for each of the years 1954 through 1957 are barred by the statute of limitations provided in section 6501(a) unless petitioner's tax returns for those years were false or fraudulent with intent to evade tax, section 6501(c), or unless, with respect to the years 1955 and 1957 petitioner omitted gross income properly includable in his returns in excess of 25 percent of the amount of gross income stated therein, section 6501(e). The burden of proving fraud is on respondent, section 7454, and he must prove by clear and convincing evidence that the deficiency was due to a deliberate attempt to evade taxes. L. Glenn Switzer, 20 T.C. 759; Arlette Coat Co., 14 T.C. 751. In his effort to carry this burden of proof respondent relies primarily on the fact that the increase in 973 petitioner's net worth in each of the years 1954 through 1958, plus petitioner's nondeductible expenditures for personal living expenses, as reflected on respondent's net worth statement, indicates that petitioner had gross income far in excess of the amounts reported on his returns, that petitioner had a likely source of taxable income, i. e., pilfering from parking meters, to *117 explain the discrepancy, and that petitioner's failure to report this income was due to fraud with intent to evade tax. Respondent also relies on the fact that petitioner failed to report interest on savings accounts in each of the years 1954-1958, and petitioner's conviction of income tax evasion on a plea of nolo contendere for the year 1957. We do not believe respondent has proved fraud by the clear and convincing evidence required. The increase in petitioner's net worth as reflected in respondent's net worth statement is substantial for each of the years 1954-1958 and far exceeds the income reported by petitioner. Repeated substantial understatements of income is evidence of fraud, but this alone need not be regarded, in and of itself, as sufficient proof that the deficiencies were due to fraud on the part of petitioner. Holland v. United States, 348 U.S. 121; Drieborg v. Commissioner, 225 F. 2d 216. The existence of fraud with intent to evade tax must be affirmatively established. Fraud is never assumed. Drieborg v. Commissioner, supra.
There can be no question that respondent was entitled to determine petitioner's income on a net *118 worth basis, and petitioner does not contend otherwise. But when the net worth method is used, particularly when respondent relies primarily on the unexplained increases therein to carry its burden of proving fraud, it is essential that respondent establish, with reasonable certainty, the opening net worth, and he must also show that he has tracked down leads furnished by the taxpayer, reasonably susceptible of being checked, which, if true, would establish taxpayer's innocence. When the respondent fails to show an investigation into the validity of such leads, the trial judge may consider them as true. Holland v. United States, supra. In this case we cannot find that respondent has shown by the evidence presented that he made a very determined effort to establish with the certainty that we would consider reasonable a complete and accurate opening net worth for petitioner, or to negative the explanations given him by petitioner which might tend to establish his innocence of fraud. The net worth statement is admittedly incomplete. It does not include furniture or furnishings which petitioner must have had in his home, it does not include several automobiles which petitioner *119 told the agents he owned prior to 1956, and it does not include any jewelry, art objects, or films and equipment which petitioner told the agents he had at home; and yet respondent's agents did not visit petitioner's home. While the presence or absence of such items in petitioner's home at the time of the investigation would not necessarily have had any direct bearing on petitioner's increase in net worth during the years 1954-1958, an inspection of petitioner's home even in 1960 might have cast some light on the possibility or probability that petitioner had some of these items on hand prior to the net worth period which might have been disposed of during the net worth period at no gain. Such an inspection might also have helped the agents in estimating petitioner's personal living expenses. While it may have been impossible for the agents to check on petitioner's story of having $40,000 cash on hand at the beginning of the net worth period, an investigation into petitioner's activities when he was in New York and while he was a constable, and into the estates of petitioner's parents, might have indicated whether petitioner could or could not have come into possession of a cash *120 hoard of that size in the manner he described to them. One of the agents apparently talked to petitioner's sister and brother-in-law about the possibility of a cash hoard and was told that petitioner's mother did have cash she was holding for petitioner, but the agent apparently attached no credence to this statement, and it does seem likely that respondent could have checked out petitioner's lead that he had received $5,000 from his former wife when they were divorced in 1952. It may be that respondent's agents did investigate all the reasonable leads petitioner gave them, but, if so, it is not apparent from the record. The picture we get from the evidence presented is that respondent concluded, without a very thorough investigation, that because petitioner was in a position that he could have stolen money from the parking meters he did so, and this was the source of the increases in petitioner's net worth. The Court is then asked to conclude primarily from this assumption that petitioner knew the 974 stolen money was taxable income and deliberately failed to report it on his returns in order to evade tax. This assumption ignores the inference that might be drawn from the fact *121 that the contemporaneous investigation of the parking meter pilfering by the city authorities failed to reveal that petitioner was implicated therein or benefitted financially therefrom. Respondent apparently made no independent investigation of the parking meter pilfering to establish this as a likely source of income. If we do not accept respondent's assumption, respondent has shown no likely source of taxable income, has not negatived very convincingly petitioner's leads to nontaxable sources of income, and has not shown any positive or affirmative act by petitioner indicating clearly and convincingly that fraud was present. Respondent argues that petitioner's failure to include in his income reported on his returns the interest accumulated on his various bank savings accounts is further proof of fraud. We recognize that the amounts involved in the later years are not inconsiderable and we agree that this fact is evidence that should be taken into consideration along with other evidence to determine whether petitioner deliberately omitted income to evade tax. Unfortunately, we do not have the benefit of petitioner's testimony as to why he failed to report this income, but the *122 fact alone that he failed to report it does not prove fraud. The same situation exists with respect to petitioner's nolo contendere plea to the charge of criminal tax evasion for 1957. While we have held that a plea of guilty to criminal tax evasion charges estops a taxpayer from denying civil fraud for the same year, Arctic Ice Cream Co., 43 T.C. 68, we have not held that a plea of nolo contendere gives rise to collateral estoppel, and respondent does not argue here that it does. Even if we assume that the nolo contendere plea is admissible as evidence in this case we do not believe that the plea alone, without some information about the circumstances in which it was entered, supports the fraud penalty here. There are indications that petitioner's health was not too good in 1965 and he may have decided that he was not physically fit to stand trial. We note that his sentence was suspended and he was placed on probation. Respondent contends that petitioner gave inconsistent statements to his agents and others in an effort to explain the source of the cash he deposited in his bank accounts during the years 1954-1958. Our review of the two transcripts of interviews with *123 petitioner heretofore mentioned and the testimony of the agents at the trial does not convince us that petitioner made any such glaringly inconsistent statements that would suggest an effort to conceal or mislead. In fact, there is no evidence that petitioner refused to cooperate with the agents or made any effort to conceal assets or to mislead the agents in any manner that would support an intent to evade tax. We have examined the entire record and are not persuaded that the evidence is sufficient to establish fraud. Respondent's case is based on inferences and assumptions which are not all supported by the evidence and we feel that respondent has not shown that he made a reasonable effort to prove the truth of the inferences and assumptions. We recognize that there is enough in the record to support a strong suspicion of fraud, but "Mere suspicion of fraud and mere doubts as to the intentions of the taxpayer are not sufficient proof of fraud." L. Glenn Switzer, supra at 765. We conclude that respondent has failed to carry his burden of proving fraud by the clear and convincing evidence required for any of the years involved. This eliminates from further consideration *124 the years 1954 and 1956, which are barred by the statute of limitations. With respect to the years 1955 and 1957, respondent relies on the 6-year statute of limitations provided in section 6501(e) to keep those years open. To have the advantage of that section respondent must prove that petitioner omitted from the gross income stated in his return an amount properly includable therein which is in excess of 25 percent of the gross income reported. David Courtney, 28 T.C. 658. While we have some reservations about the completeness of respondent's net worth statement, there can be little doubt about the accuracy of the items that are contained therein, except for the "below the line" adjustments for estimated cash personal living expenses. Petitioner has stipulated that the items reflected in the net worth statement are correct; he claims only that the opening net worth is not complete in that it gives no credit for cash on hand and certain other items. We think the undisputed increases in petitioner's bank accounts and other investments during both of the years 1955 and 1957 are sufficient to carry respondent's 975 burden of showing omissions of gross income in those *125 years, thus shifting to petitioner the burden of explaining why these increases did not represent taxable income, which petitioner has failed to do. Respondent's net worth computation reflects unreported adjusted gross income. Petitioner claimed no decuctions from the gross income reported on his returns that would make his gross income differ from his adjusted gross income, and has suggested none at the trial. Thus it is clear that the unreported adjusted gross income reflected on respondent's net worth statement results from omitted gross income rather than excessive deductions, see David Courtney, supra, which for each of the years 1955 and 1957 exceeds by more than 25 percent the gross income reported on petitioner's returns for those years. Consequently, the years 1955 and 1957 are open for assessment of additional tax under section 6501(e). The year 1958 is open on waivers. This leaves for decision only the amount of the deficiencies for the years 1955, 1957, and 1958. Respondent's determination of the deficiencies is presumed to be correct and petitioner has the burden of proving error therein. Banks v. Commission, 322 F. 2d 530. In fraud cases, *126 both the respondent, who has the burden of proving fraud, and the petitioner, who has the burden of proof with regard to the deficiencies, may fail through inadequate proof on their respective issues. Drieborg v. Commissioner, supra.Petitioner claims that respondent's net worth computation of his taxable income is erroneous and invalid and does not correctly reflect petitioner's income. However, petitioner has offered no direct evidence to show specific errors in respondent's net worth computation. He claims that petitioner had cash on hand at the beginning of the net worth period, and indeed we believe petitioner probably did have some cash on hand at that time, but in the course of this trial petitioner has offered no evidence that would permit us to determine how much he had or when it was used to augment assets shown on the net worth statement. Even if petitioner had on hand the $5,000 he told the agents he received from his divorced wife in 1952, this would all be used in accounting for the increase in his bank accounts in 1954. Petitioner also claims that respondent's estimate of his living expenses was too high. While we would prefer to have better evidence to *127 support those estimates, they are not so high as to be unreasonable per se, and it was up to petitioner to offer evidence to prove they were too high. We must conclude that petitioner has failed to carry his burden of proving error in respondent's determination of the deficiencies in his taxable income for the years 1955, 1957, and 1958. In summary, we conclude that respondent has failed to prove fraud for any of the years involved and hence the 50 percent addition to tax for fraud will not be applied for any of those years, and assessment of deficiencies for the years 1954 and 1956 is barred by the statute of limitations. The years 1955 and 1957 are open for assessment of deficiencies under section 6501(e), and petitioner agrees that the years 1958 and 1959 are open. We approve the deficiencies in tax as determined by respondent for each of the years 1955, 1957, 1958, and 1959, except that the computation of petitioner's taxable income for the years 1957 and 1958, and the resulting deficiency in taxes, shall be adjusted by eliminating from respondent's net worth computation the item of $4,000 cash on hand at December 31, 1957, in accordance with the net worth statement offered in *128 evidence by respondent's agent Kreidler. Decision will be entered under Rule 50. Footnotes
1. All statute references are to the Internal Revenue Code of 1954 unless otherwise stated.↩